KENTUCKY HARLAN COAL COMPANY, Appellant,

v.

Frank HOLMES; Special Fund; Ronald L. McDermott, Administrative Law Judge; and Workers' Compensation Board, Appellees,

and

COMMONWEALTH of Kentucky, DEPARTMENT OF MINES AND MINERALS, Appellant,

v.

Arthur MOORE; Larry Beale, Director of Special Fund; David Barber, Administrative Law Judge; and Workers' Compensation Board, Appellees.

Nos. 92–SC–1073–WC, 93–SC–027–WC.

Supreme Court of Kentucky.

Jan. 31, 1994.

Rehearing Denied April 21, 1994.

Paul E. Jones, Baird, Baird, Baird & Jones, Pikeville, for appellant, Kentucky Harlan Coal Co.

Dennis Nagle, Cole, Cole, Anderson & Nagle, Barbourville, for appellee, Frank Holmes.

David Randall Allen, John E. Stephenson, Louisville, for Special Fund.

Ronald L. McDermott, Covington, Administrative Law Judge.

Thomas L. Ferreri, C. Patrick Fulton, Ferreri and Fogle, Louisville, for appellant, Comm. of Kentucky, Dept. of Mines and Minerals.

George C. Perry, III, John David Preston, Perry and Preston, Paintsville, for appellee, Arthur Moore.

Mark C. Webster, Louisville, for Special Fund.

David Allen Barber, Barber, Rowland & Paxton, Prestonsburg, Administrative Law Judge.

L.T. Grant, Com'r, Dept. of Workers' Claims, Valerie L. Salven, Workers' Compensation Bd., Frankfort, Workers' Compensation Bd.

REYNOLDS, Justice.

In two consolidated cases we address the issue of the constitutionality of KRS 342.-732(1)(d) which declares:

> If the administrative law judge finds that an employee has occupational pneumoconiosis with a radiographic classification of category 2/1, 2/2, 2/3, 3/2, 3/3, or progressive massive fibrosis, based on the latest 1LO International Classification of Radiographics, there shall be an irrebuttable presumption that the employee is totally

disabled resulting from exposure to coal dust and the administrative law judge shall award income benefits equal to sixty-six and two-thirds percent (66⅔%) of the employee's average weekly wage but not more than one hundred percent (100%) of the state average weekly wage and not less than twenty percent (20%) of the average weekly wage of the state as determined by KRS 342.740. Income benefits awarded under this paragraph shall be payable to the employee during such disability.

The statute essentially provides income benefits for occupational pneumoconiosis resulting from coal dust exposure, upon a finding that an employee has fixed/defined radiographic evidence of simple coal workers' pneumoconiosis. There shall be an irrebuttable presumption that the employee is totally disabled therefrom.

Kentucky Harlan Coal Company, Department of Mines and Minerals, and the Special Fund are arrayed against the constitutionality of the statute.

In the case of *Commonwealth of Kentucky, Department of Mines and Minerals v. Arthur Moore, and Special Fund, et al.,* the basic facts are that Arthur Moore, an employee of the Department of Mines and Minerals, was determined by the Administrative Law Judge to have pneumoconiosis of 2/2 or above. The irrebuttable presumption provided by the statute was applied. No argument as to a determination of Moore's ability to perform some work was considered because of the irrebuttable presumption mandating total, permanent disability. Appellant's argument centers upon the statute.

In the case of *Kentucky Harlan Coal Company v. Frank Holmes, and Special Fund, et al.,* the basic facts are not at issue. The employer raises issues additional to that of the constitutionality of the statute which are later addressed in this opinion.

It is contended that the statute is unconstitutional on four counts: (1) that it is special legislation contrary to Section 59(24) of the Kentucky Constitution; (2) that there is no rational basis/connection between the fact proved and the ultimate fact presumed; (3)

that it is violative of due process rights; and (4) that the statute violates equal protection.

The constitutionality of KRS 342.732(1)(d) was upheld, in both cases, by the Court of Appeals. We affirm.

### BACKGROUND

The social, economic and legislative history of the Act provides a basis for the statute's enactment in 1987 at an extraordinary session of the Kentucky legislature. In view of a rising concern that the cost of workmen's compensation and the increasing liability of the Special Fund would deter industrial development and encourage existing industries to depart the state, a task force of highly representative members conducted multiple meetings in 1986 and 1987. Studies by medical, economic, labor, management, actuarial and financial consultants culminated in a special legislative session.

Factors, including the following were determined:

1. Approximately 78% of the Special Fund's liability in the five years preceding July 1987, was attributable to the coal industry. More than 95% of the Special Fund's liability for occupational disease is attributable to coal workers' pneumoconiosis (black lung). Approximately 30% of the Special Fund's liability for traumatic injury is attributable to the coal industry. Finally, the failure to pre-fund and invest the sums necessary to meet Special Fund liabilities had produced an unpredictability and undue burden on all employers, as it was their annual assessments that were used to meet the Special Fund's liabilities.

2. Other facts before the legislature:

a. For the five years prior to 6/30/87, an average of over 700 occupational disease claims per year involved Special Fund liability due to coal workers' pneumoconiosis. During that period, the annual addition to the Special Fund's liability represented by new claims increased from $157,298,000 to $235,840,000. Edward H. O'Daniel, Jr., *1987 Kentucky Workers' Compensation Law,* Foreward.

b. Before the 1987 Act, functional impairment played virtually no part in determining

eligibility for pneumoconiosis benefits. Black lung benefits tended to be awarded on an all-or-nothing basis. Of 5,372 black lung awards made between 1/1/73 and 11/1/87, 90.5% were for total, occupational disability and only 9.5% were for permanent, partial, occupational disability. O'Daniel, *supra*, at 21.

c. Pursuant to x-ray examination, pneumoconiosis is classified as simple or complicated depending on the size of the opacities present in the patient's lungs. The presence of opacities smaller than one centimeter in diameter indicates the presence of simple pneumoconiosis; whereas, the presence of opacities larger than one centimeter in diameter indicates the presence of complicated pneumoconiosis. Simple pneumoconiosis is subclassified by the number of opacities present as category 1, 2, or 3, with category 2 representing x-rays with a moderate number of opacities and category 3 representing x-rays with more opacities than are typical of simple pneumoconiosis. Simple pneumoconiosis, even if category 3, is not usually associated with any significant decrease in lung function; whereas, complicated pneumoconiosis, particularly in its more advanced forms, is often associated with severe clinical disease and moderate to severe pulmonary dysfunction. O'Daniel, *supra*, at 13–15.

d. It was recommended by medical experts that pulmonary dysfunction be measured by spirometric testing, using the test which represented the best efforts of the patient. Medical testimony recommended that both x-rays (to determine the presence of the disease) and pulmonary function tests (to determine the severity of any respiratory impairment) be used to determine the level of benefits to be awarded. O'Daniel, *supra*, at 16.

e. X-ray studies by Drs. Anderson and Lane revealed that of Kentucky workers who filed for federal black lung benefits between 43–61% had the disease. From 42–59% of the cases were simple coal workers' pneumoconiosis, and from 1–2% were complicated coal workers' pneumoconiosis. A study conducted by the National Institute for Occupational Safety and Health (NIOSH) reported that 89% of coal miners with pneumoconiosis

fall in 1LO category 1, the lowest category of simple pneumoconiosis. O'Daniel, *supra*, at 23.

f. It was projected that under KRS 342.-732, the proposed legislation for black lung claims, awards would be distributed as follows:

64%—§ 732(1)(a) RIB (category 1 simple, less than 20% impairment)

12%—§ 732(1)(b) 75% (category 1 simple, 20–45% impairment)

4%—§ 732(1)(c) 100% (category 1 simple, more than 45% impairment)

20%—§ 732(1)(d) 100% (category 2 or 3 simple; complicated)

O'Daniel, *supra*, at 22.

Legislative Enactments—Relevant General Provisions:

1. KRS 342.1201—legislative findings and declarations regarding the negative economic impact of the coal industry on all of Kentucky industry via Special Fund assessments and declaration of the legislature's intent to impose more of the cost of workers' compensation that results from the coal industry on that industry.

2. KRS 342.122—was amended to provide for a combination of funding and prefunding and investment to meet the present and future liabilities of the Special Fund. In addition to the 23.3% Special Fund assessment imposed on the insurance or self-insurance premiums of all employers, the coal industry was assessed an additional 40%. (Under current law the basic assessment is 16.9% for all industries plus an additional 47% for the coal industry, for a total of 63.9%.)

3. KRS 342.1223, et seq.—were enacted to provide for a workers' compensation funding commission to control, invest, and manage the funds collected pursuant to KRS 342.122.

Legislative Enactments Regarding Occupational Disease:

1. Coal workers' pneumoconiosis

a. History—coal workers' pneumoconiosis was responsible for 95% of the Special Fund's occupational disease liability. Over 90% of awards were for total disability, but

medical evidence indicated that approximately 89% of workers with coal workers' pneumoconiosis had category 1 disease which, by itself, typically is not associated with significant pulmonary impairment.

b. KRS 342.316(2)(b)1.b.—each clinical examination shall include chest x-ray and spirometry.

c. KRS 342.316(2)(b)2.—detailed and specific requirements for admissible medical evidence which refer to standards in the AMA's *Guides to the Evaluation of Permanent Impairment (Guides )*.

d. KRS 342.316(3)(b)—income or retraining incentive benefits for coal workers' pneumoconiosis are not payable unless the worker meets a specified minimum continuous exposure requirement in Kentucky.

e. KRS 342.732—Occupational disability is presumed and benefits are awarded in graduated increments based on the severity of the disease and the degree of pulmonary impairment. Increments are tied to the AMA *Guides.* Where the disease is more advanced (category 2 or 3 simple or complicated), a showing of pulmonary impairment is not required.

f. KRS 342.197(2)—prohibits discrimination against workers with category 1 coal workers' pneumoconiosis.

2. Other occupational pneumoconioses:

a. History—other occupational pneumoconioses and all other occupational diseases comprised only 5% of the Special Fund's liability for occupational disease. There was no indication of typical functional impairment or what percentage of awards were for total disability.

b. KRS 342.316(2)(b)1.c.—each clinical examination shall include chest x-ray and appropriate pulmonary function tests.

c. No specific requirements for admissible medical evidence.

d. No minimum exposure requirement.

e. KRS 342.730—the worker is required to show that the presence of the disease and whatever functional impairment it causes has produced an occupational disability as defined by KRS 342.0011(11).

f. KRS 342.197(1)—prohibits discrimination against workers who have filed a claim for workers' compensation benefits.

### SPECIAL LEGISLATION ISSUE

■ Appellants rationalize that the compensation statute (KRS 342.732[1][d] ) is violative of special legislation by arbitrarily excluding from the classification numerous others who stand in the same relationship. The parties recite Kentucky Constitution, Section 59, Item 24, which provides that the General Assembly shall not pass local or special acts concerning any of the following subjects, or for any of the following purposes, namely: To regulate labor, trade, mining or manufacturing. While appellants offer *Tabler v. Wallace,* Ky., 704 S.W.2d 179 (1985), as being determinative that the compensation statute is unconstitutional, we markedly disagree. *Tabler* is highly and historically instructive of Kentucky Constitution, Section 59, and it (in that case) determined there was no natural, real or substantial distinction to justify the classes created by the statute in controversy. The court therein recited that while evidence of reasons that might have supported a perceived need for classification was presented, there was no evidence that those reasons actually existed. In this case there are supportive and perceived reasons amply punctuated by the evidence. In *Tabler,* there was ample lobbying for the enactment of the statute under review. There was absolutely no evidence of committee meetings or legislative debate discussing its purposes. *Tabler, supra,* at p. 187. The record supporting the passage of KRS 342.732(1)(d) is replete with reasons, evidence of committee meetings, and debate discussing its purposes.

■ We restate that the Commonwealth's power to legislate public policy in the area of employer/employee relations derives from its police power, and the fact that there is a community interest in regulating the safety of the workplace and in requiring employers to provide for injured workers and their dependents so that they do not become a burden on the community. *Workmen's Compensation Board of Kentucky v. Abbott,* 212 Ky. 123, 278 S.W. 533 (1925).

■ The primary purpose of Kentucky Constitution, Section 59 is to prevent special privileges, favoritism, and discrimination, and to insure equality under the law. "A special law is legislation which arbitrarily or beyond reasonable justification discriminates against some persons or objects and favors others." *Bd. of Educ. of Jefferson County v. Bd. of Educ. of Louisville*, Ky., 472 S.W.2d 496, 498 (1971).

■ While appellants assert the Act as special legislation, the appellees insist otherwise. As we have generally established in this jurisdiction, in order for a law to be general in its constitutional sense it must meet the following requirements: (1) it must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification. The second requirement is as essential as the first. The legislature may not arbitrarily designate the severed factions of the original unit as two classes and thereupon enact different rules for the government of each. It is equally established that the classification, as made, must be based upon some reasonable and substantial difference in kind, situation or circumstance which bears a proper relation to the purpose of the statute. It is also necessary to determine that the legislative classification, when based on police power, must further objectives relevant to that power. *Schoo v. Rose*, Ky., 270 S.W.2d 940 (1954).

Collaterally, it has been held that legislative classifications may be used to regulate employer/employee relations where the classification is consistent with correcting an abuse or problem which the legislation seeks to cure. Where the statute sought to correct an abuse that was present only in the mining industry and only in larger mining companies, there was no need to include other industries or smaller companies in order to correct the abuse. The class created was reasonable, natural, and consistent with the legitimate purpose of government. *Commonwealth v. Hillside Coal Co.*, 109 Ky. 47, 58 S.W. 441 (1900).

■ Where the classification enacted by the legislature in the statute has a reasonable basis, such law does not constitute special or local legislation within the prohibition of Section 59 of the Kentucky Constitution nor does it deny the equal protection guaranteed by the United States Constitution. When the purpose of the enactment is to correct a prior legislative inequity, then the classification which accomplishes that purpose will be permitted. *Hyde v. Haunost*, Ky., 530 S.W.2d 374 (1975).

Contrary to appellants' arguments, the fact that the Workers' Compensation Act applied only to certain employers and employees and not to all employers and employees did not render it special legislation. *Greene v. Caldwell*, 170 Ky. 571, 186 S.W. 648 (1916).

This court, in recent decisions, recognized the historical significance behind the enactment of the Teachers' Retirement Act and satisfactorily explained the legitimate purpose behind exempting contributions to the teachers' retirement system from being classified as marital property upon divorce, and not exempting contributions to other retirement plans. Under such circumstance, the classification was upheld. KRS 161.700(2); *Waggoner v. Waggoner*, Ky., 846 S.W.2d 704 (1993).

A classification based on population would be considered special legislation where the question of population had no appreciable relevancy to accomplishing the purpose of the legislation. *City of Louisville v. Klusmeyer*, Ky., 324 S.W.2d 831 (1959). However, the court held where the sheer population of a class creates special needs or problems in accomplishing the legislative purpose that are not present or are present to a lesser degree in a less populous class, different treatment based on population can be justified. *Shannon v. Wheeler*, 268 Ky. 25, 103 S.W.2d 718 (1937).

We find that KRS 342.732 (enacted in 1987), which created a classification including coal workers who have contracted occupational pneumoconiosis, was a part of a comprehensive revamping of the entire Kentucky Workers' Compensation Act. This was a clearly demonstrated response to the widely recognized need to deal with the ominous burden placed on all of Kentucky industry, through Special Fund assessments, by the

cost of workers' compensation claims relating to the coal industry. It was a founded fear that because of the burgeoning cost of workers' compensation, particularly due to the pay-as-you-go method of Special Fund financing, industries would leave the state or fail to locate in Kentucky, thereby increasing unemployment. Approximately 78% of the Special Fund's overall liability and over 95% of its liability for occupational disease was attributable to the coal industry. Legislative recommendations were derived from the 15 months' study of a 16–member task force, representing both industry and labor. A Special Session of the General Assembly was called solely to consider the proposed legislation. Some of the major concerns of the legislature were expressed in KRS 342.1201.

We discern that the legislation approached the problems by: 1) providing for sufficient Special Fund assessments on workers' compensation insurance premiums of all industries to allow for funding to meet present obligations and prefunding and investment to meet future obligations in order to put the Special Fund on a more sound financial footing (KRS 342.122; KRS 342.1223, et seq.); 2) placing an additional Special Fund assessment on the coal industry in order to more nearly equate payments by that industry to liabilities resulting from that industry (KRS 342.122); and 3) incorporating medical realities into both the standards for the admissibility of evidence for claims involving coal workers' pneumoconiosis (KRS 342.316), the standards of proof for the various levels of benefits set forth in the newly-enacted KRS 342.732.

Clearly, KRS 342.732 applies equally to all coal workers who have contracted pneumoconiosis and the legislative history provides distinctive and natural reasons for classifying them separately from workers in other industries who have also contracted pneumoconiosis. The problem was caused, not by pneumoconiosis, but by coal workers' pneumoconiosis. Therefore, there was no necessity to include workers with other occupational pneumoconioses in order to remedy the problems which the legislation sought to correct. Coal workers' pneumoconiosis accounted for 95% of the Special Fund's liability for occu-

pational disease, and over 90% of awards for the disease were for total disability. Other pneumoconioses comprised only part of the remaining 5% of occupational disease claims, and there was no indication that over 90% of awards for other pneumoconioses were for total, occupational disability. The sheer number of coal workers' pneumoconiosis claims involving the Special Fund and the economic impact of those particular claims on the entire system is further justification for a more standardized treatment of those claims.

■ It appears the subclassifications within the statute are based on pulmonary impairment and/or on the degree to which the disease has progressed (from few, small opacities; to many, small opacities; to large opacities). These constitute substantial differences in the degree to which the disease affects the workers' health and the necessity to their health of leaving the mining industry.

The mere fact that the legislative treatment of coal workers' pneumoconiosis is different from that of other occupational pneumoconioses does not make it arbitrary or unfair to either group. Workers with coal workers' pneumoconiosis are entitled to a presumption of occupational disability based on the medical criteria of the various subsections of KRS 342.732, but their standards for admissible medical evidence are more stringent and they are required to meet a minimum exposure requirement before they may receive benefits. Based on the projections before the legislature, the relative proportion of total occupational disability awards under KRS 342.732 would decrease to approximately 24% from the over 90% that had been awarded under KRS 342.730. This proportion was expected to be more consistent with the medical realities of the disease. Quite clearly, the legislature did not establish an easier standard for workers than that in KRS 342.730 as the employer here suggests. Workers with other occupational pneumoconioses are not subject to the stringent medical proof requirements or minimum exposure requirements, but are required to prove the degree to which their disease has caused them to be occupationally disabled. There are no standards for the type of proof necessary to prove occupational disability other

than that there must be some evidence of substance to support the ALJ's decision. There is often nothing more than a physician's statement that the worker must avoid a dusty environment and testimony that the worker has never worked in any occupation but his present one.

It was projected that KRS 342.732 would decrease the number of total, occupational disability awards for coal workers' pneumoconiosis. The anti-discrimination provision contained in KRS 342.197(2), which applies only to coal workers' pneumoconiosis, works together with the presumptions of disability contained in KRS 342.732 to help assure that workers will, in fact, be no more occupationally disabled than the statute presumes.

### RATIONAL BASIS ISSUE

█ It is further argued that the Act (KRS 342.732[1][d] ) is unconstitutional in that no rational basis or connection exists between the fact proved and the ultimate fact presumed. We note a dissimilarity between the test advanced by the Department and that which is enunciated in *Mobile, J. & K.C.R. Co. v. Turnipseed,* 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910), and which more succinctly states: "(I)t is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." We determine that *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), which, in part, supports the irrebuttable presumption of a coal miner's total disability due to pneumoconiosis, created by Section 411(c)(3) of the amended Federal Coal Mine Health and Safety Act (30 USCS § 921[c][3] ) upon clinical evidence (ordinarily x-ray evidence) that the miner is afflicted with complicated pneumoconiosis, is not unconstitutionally unreasonable and arbitrary. Additionally, legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law. It is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the

inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. *Usery, supra.* We agree that the process of making a determination of rationality is, by its nature, highly empirical, and in matters not within the specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of the law making body to amass the matters of actual experience and to cull conclusions from it. *See United States v. Gainey,* 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). Utilizing such standards, a presumption may be declared constitutionally valid.

### DUE PROCESS ISSUE

█ The unconstitutionality of the statute is further argued upon the premise that the irrebuttable presumption of KRS 342.-732(1)(d) deprives the employer of its property without due process of law. Both the Fourteenth Amendment of the United States Constitution and Section 2 of the Kentucky Constitution are advanced to demonstrate that due process and irrebuttable presumption are almost inherently irreconcilable concepts. The Department, citing *Wigmore on Evidence,* (9 John Henry Wigmore, *Evidence in Trials at Common Law* § 1353[2] [Chadbourn Ed.1972] ) as supporting its argument that the legislature may not provide that certain evidence shall be conclusive, simply fails to fully acknowledge *Wigmore.* When a court believes a result to be a more likely approach in truth than its own investigations could obtain, then the latter principle may prevail. Further, it is clear that a rule of conclusive evidence may not be a rule of evidence at all, but a rule of substantive law. The power of the legislature to prescribe what shall constitute conclusive evidence, however, in particular instances, has been upheld in a number of cases. Reference to the authority of the legislature to provide that certain acts shall constitute conclusive evidence in civil cases, including that of the occupational disease, is found in 16 C.J.S., *Constitutional Law,* § 128, page 531 (1956); 16A Am.Jur.2d, *Constitutional Law,* § 852, pp. 1068, 1069 (1979).

■ We hold that equal protection under the First, Second and Third Amendments to the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution is validly accomplished as, in this case, when a statute involving the regulation of economic matters comports with both state and federal equal protection if the law is rationally related to a legitimate governmental objective. The constitutionality of a statute will be upheld if its classification is not arbitrary, or if it is founded upon any substantial distinction suggesting the necessity or propriety of such legislation. *See Waggoner, supra.* The standard, equating to equal protection, was similarly met in the agricultural exclusion provided in the Workers' Compensation Act (KRS 342.650), which did not violate federal or state equal protection by classifying agriculture workers differently from workers in other industries. *Fitzpatrick v. Crestfield Farm, Inc.,* Ky.App., 582 S.W.2d 44 (1978).

Decidedly, KRS 342.732 and the classifications created therein are rationally related to a legitimate state objective, affording protection to all of Kentucky industry, (and hence, the employment/jobs of Kentucky workers) from an economic drain caused by Special Fund assessments for compensation claims directly related to the coal industry, and particularly those due to high incidence of coal workers' pneumoconiosis. As the problem the legislature sought to solve was attributable to the coal industry, the solution therefor need deal only with workers of that industry. Said otherwise, the classification of coal workers with pneumoconiosis was founded on a substantial distinction that was necessary in view of the legislative history.

### EQUAL PROTECTION ISSUE

■ Appellants relate that KRS 342.-732(1)(d) is unconstitutional as violative of the equal protection of the law. We disagree with appellants' argument that the questioned statute violates Sections 1, 2, and 3 of the Kentucky Constitution which provide that the legislature does not have arbitrary power and shall treat all persons equally. The thrust of appellants' argument as to this part of the issue amounts to whether there is a rational basis for the classification involved in the statute. The presumptions employed in KRS 342.732 bear both a direct and rational connection to the medical realities concerning the seriousness of the degree of coal workers' pneumoconiosis present in a given worker. Referencing § 732(1)(d), workers with category 2 or 3 coal workers' pneumoconiosis have more advanced disease than those with category 1 disease, and the medical need for them to leave a dusty coal work environment would be more urgent than for workers with category 1 disease. Based on the statistics before the legislature regarding a disposition of pre–1987 claims, an inference that a worker with category 2 or 3 disease would have been adjudged totally, occupationally disabled was not arbitrary or unwarranted.

■ With full regard to equal protection, an irrebuttable presumption, in a civil case, is in effect a substantive rule of law. As such there must be a rational connection between the fact proved and the ultimate fact presumed. The inference of one fact from proof of another shall not be so unreasonable as to be arbitrary. The exclusion of other relevant factors affecting the ultimate fact alone does not render a presumption arbitrary. *See Usery, supra.*

### REMAINING KENTUCKY HARLAN COAL COMPANY ISSUES

While the basic facts are not at issue, we recite that Holmes had worked 14 years as an underground coal miner for Kentucky Harlan and had taken the company physical (inclusive of x-rays) prior to employment. He ceased work in May of 1989 because of stomach complaints. Prior to mining work, he had been employed at a foundry and denied breathing problems prior to Harlan Coal Company employment. There was substantial medical evidence ranging from a showing of no pneumoconiosis to that of category 2/2 pneumoconiosis. Additionally, some medical proof disclosed a mixed type pneumoconiosis relating to exposure to sand, coal and iron dust. In essence, the medical evidence ranged from little or no pulmonary impairment to restrictive impairment.

 The employer argues there was insufficient medical evidence to support a finding that Holmes suffered from coal miner's pneumoconiosis, but still another physician found radiographic evidence compatible with category 2/1 pneumoconiosis. Yet another physician found pneumoconiosis type P/Q, which is the exact type of reading which another physician testified as showing pure coal worker's pneumoconiosis. Under these facts, the administrative law judge as fact finder, can believe part of the evidence and disbelieve other parts, even if such proof comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores,* Ky., 560 S.W.2d 15 (1977). Most clearly and decidedly, the language of KRS 342.732(1)(d) renders the employer's argument untenable. As long as there was some exposure to coal dust and a reading of at least category 2/1 pneumoconiosis upon which the ALJ relied, there is the irrebuttable presumption, i.e., total disability and that the disability resulted from coal dust exposure.

 The employer maintains that in the event pneumoconiosis is a proper diagnosis the ALJ erred by failing to make a finding of mixed pneumoconiosis and resultantly apply KRS 342.730. Whatever the direction of the argument on this issue, it is necessary that the last employer, Kentucky Harlan Coal Company, bear the burden of proving multiple exposure. *Stovall v. Mullen,* Ky.App., 674 S.W.2d 526 (1984). Thus, the question is whether the evidence is so overwhelming, upon considering this record as a whole, that the court is compelled to make a finding in the employer's favor. *See Wolf Creek Collieries v. Crum,* Ky.App., 673 S.W.2d 735 (1984). The medical testimony is simply lacking upon this issue.

 In cases where workers have a mixed exposure to both coal dust and other dust, KRS 342.732 would apply if inhalation of coal dust was a substantial medical cause of any respiratory impairment the worker exhibited. *See Newberg v. Reynolds,* Ky., 831 S.W.2d 170 (1992). Presumably it would also apply if inhalation of coal dust was a substantial medical cause of the x-ray diagnosis of the disease for the purposes of KRS 342.732(1)(a). Irrespective, in the Holmes case the ALJ determined that the prior exposure to sand, iron dust, and welding fumes did not contribute to the worker's pneumoconiosis and was affirmed on that issue successively by the Workers' Compensation Board and the Court of Appeals. There being no gross error in that decision, KRS 342.732 would apply, regardless.

The employer maintains that had pneumoconiosis been established, benefits should have been apportioned pursuant to KRS 342.316(10)(a). Appellant gives no authority to bolster this argument. Substantial evidence supports the ALJ's findings.

 In deciding whether an act of the General Assembly is unconstitutional, we necessarily have begun with the strong presumption in favor of constitutionality and so conclude. *Brooks v. Island Creek Coal Co.,* Ky.App., 678 S.W.2d 791 (1984). Courts cannot assume that actions of the legislature are capricious, and, generally, they are afforded the presumption of regularity. *Delta Air Lines, Inc. v. Commonwealth, Revenue Cabinet,* Ky., 689 S.W.2d 14 (1985).

The opinions of the Court of Appeals are affirmed.

LAMBERT, STUMBO and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., dissents by separate opinion in which LEIBSON and SPAIN, JJ., join.

LEIBSON, J., dissents by separate opinion in which STEPHENS, C.J., joins.

STEPHENS, Chief Justice, dissenting.

Respectfully, I dissent.

With apologies to Gertrude Stein, "pneumoconiosis is pneumoconiosis is pneumoconiosis." The majority opinion erroneously upholds the constitutionality of discriminatory, class-based legislation which severs a natural class of disabled workers, all of whom suffer from the same disease, occupational pneumoconiosis. The statute unconstitutionally metes out special benefits to some members of the class based solely on the environmental source of the particles which cause their

disease. The flip side of this distinction is a concomitant severance of a natural class of employers, only some of whom must bear the cost of those special benefits, without an opportunity to offer evidence to the contrary. In my view, KRS 342.732(1)(d) is precisely the type of legislation that § 59(24) of the Kentucky Constitution prohibits.

The majority opinion addresses the special legislation challenge by reciting the well known factors for determining whether a law is "general," for purposes of constitutional analysis. The test was set out forty years ago in *Schoo v. Rose,* Ky., 270 S.W.2d 940 (1954). The law must meet the following requirements: (1) it must apply equally to all in a class, and (2) there must be distinctive and natural reasons inducing and supporting the classification.

With respect to the first factor, the majority concludes that "KRS 342.732(1)(d) applies equally to *all coal workers* who have contracted pneumoconiosis." (emphasis added). This is decidedly true. However, this is the right answer for the wrong class. By narrowing the relevant class definition to include only coal workers, the majority makes it axiomatic that the statute "applies equally to all in the class."

Many examples of prior § 59 cases serve to illustrate the flaw inherent in a misidentification of the relevant class. In *Gillis v. Yount,* Ky., 748 S.W.2d 357 (1988), the unconstitutional statute exempted unmined coal from being considered "real property" for tax purposes. Unlike in the present case, the class subject to analysis was *not* the class of "all unmined coal." Instead the Court properly viewed the relevant class as (at least) the class of "all unmined minerals," if not "all other interests in real estate." *Gillis* at 363.

Similarly, in *Tabler v. Wallace,* Ky., 704 S.W.2d 179 (1985), the challenged statute granted immunity to architects, engineers, and builders from personal injury liability occurring after five years from the date of substantial completion of the building or improvement. In *Tabler* the relevant class correctly included all of the individuals (e.g. materialmen, etc.) who could properly be named as defendants in a particular action, not simply the architects, engineers and builders. Using the present majority's approach to class definition, the *Tabler* court would have been forced to the conclusion that since the statute applies equally to all architects, engineers and builders, the first prong of the *Schoo* test is met.

As a general proposition, an unduly narrow view of the class to be analyzed under the *Schoo* test will yield, ipso facto, a self-sustaining classification (as to the first prong,) no matter how outrageous it might be. For purposes of § 59 analyses, it only makes sense that the relevant class for determining whether a statute applies equally to all in the class is the original unit severed, not the severed subclass.

The majority's use of the classification upheld in *Greene v. Caldwell,* 170 Ky. 571, 186 S.W. 648 (1916) as analogous to the present scheme also confuses the law on classification. In fact, that case serves as authority for the proposition of this dissent. In *Greene,* the Court upheld the Workers' Compensation Act of 1916 against a special legislation challenge. The majority opinion generalizes the classification to a fault in an effort to draw support for its conclusion in this case. The opinion states, "Contrary to appellant's arguments, the fact that the Workers' Compensation Act applied only to certain employers and employees and not to all employers and employees did not render it special legislation." The resulting implication, that if the *Greene* classification is constitutional, then KRS 342.732(1)(d) is as well, further demonstrates the majority's misunderstanding of what constitutes permissible or impermissible classification.

The key difference is that the classification established by the Act of 1916 is a broad one which does not necessarily, but theoretically can, accommodate all employers and employees. If, as the majority argues, it "applies only to certain employers and employees and not to all [of them]," it is solely because the excluded employer or employee has *elected* for the legislation not to apply. Unlike KRS 342.730(1)(d), the Workers' Compensation Act of 1916 provides the employer and employee a choice. Each can opt to be similarly situated with the class affected by the legisla-

tion, or not. That makes the two statutes radically different, and unavailable for meaningful comparison on this point.

The majority also concludes that the second prong of the *Schoo* test is satisfied, finding distinctive and natural reasons inducing and supporting the classification. "The sheer number of coal workers' pneumoconiosis claims involving the Special Fund and the economic impact of those particular claims on the entire system is further justification of a more standardized treatment of those claims." However, this conclusion, too, flows from faulty analysis.

The majority correctly states that *Tabler v. Wallace*, supra, is "highly and historically instructive of Kentucky Constitution, Section 59." It then attempts to distinguish the present statute principally by highlighting the differences in the circumstances under which the two statutes were passed. The unconstitutional architect/builder immunity statute in *Tabler* was enacted, that court determined, solely in response to the influence of special interest groups. *Tabler* at 184. More significantly, the Court found, it was enacted without benefit of committee meetings or legislative debate concerning its purpose. *Id.* In contrast, the present statute was "derived from the 15 months' study of a 16–member task force, representing both industry and labor." Moreover, "[t]he record supporting the passage of KRS 342.-732(1)(d) is replete with reasons, evidence of committee meetings and debate discussing its purposes."

While the *Tabler* court's discussion of special interest lobbying contributes to an understanding of the historical framework of and purposes behind § 59, it neither embodies nor represents the well established considerations which, in this jurisdiction, are dispositive of a § 59 challenge. In the same vein, while evidence demonstrating a rational purpose behind a classification scheme is a necessary condition to its constitutionality under § 59, it is not a sufficient condition. Our cases make this abundantly clear.

The majority's use of a "bare-bones" rational purpose test to uphold this legislation under § 59 is erroneous because the most this analysis demonstrates is that the statute comports with equal protection. But in *Tabler*, this Court clearly recognized that "Section 59 is *more* than simply another way of restating the generalized language of the equal protection clause[s]" of either the federal or state constitution. *Id.* at 183. (emphasis added). Indeed, § 59 enhances the protective principles for which equal protection already provides. It requires not merely the existence of a rational purpose underlying a classification. It mandates that the classification itself be "based upon a natural, real, or substantial distinction *inhering in the subject matter* [of the law]." *City of Louisville v. Klusmeyer*, Ky., 324 S.W.2d 831, 834 (1959). However rational it may be to require the coal industry to shoulder the burden that derives from that industry, the manner in which KRS 342.732(1)(d) seeks to accomplish that policy choice is unjustifiable under our law.

"Pneumoconiosis" is simply a generic term for a lung disease evidenced by pigmentation and fibroid induration. The disease is traceable to not only coal dust, but other types of dust particles as well. Some of these include: aluminum (aluminosis), asbestos (asbestosis), cotton dust (byssinosis), iron (siderosis), sandstone (silicosis), tobacco (tabacosis), and ostrich feathers (ptilosis). The fact that these many other environmental sources of particles also cause pneumoconiosis is the proverbial fly in the ointment for this legislative scheme. There is no medical evidence whatever that any characteristic of disease, itself, supports a "natural" or "real" distinction in the class of workers who contract it, based on whether the employee was a coal miner or custodian of the ostrich cage at the Louisville Zoo.

Such individuals, vis a vis pneumoconiosis, are absolutely similarly situated in the eyes of the law. Each is a disabled worker with an occupational lung disease called pneumoconiosis. Each contracts the disease in basically the same way, albeit from a different source. Each is diagnosed in the same manner by a physician specializing in lung disease. Each has elected to exercise a right to advance his/her claim for benefits in the workers' compensation arena. However, one

is subject to unjustifiably disparate treatment under the law.

A worker from a non-coal industry whose lung x-rays reveal the presence of opacities of a size and stage substantially similar to the coal worker at the next x-ray machine must bring his/her claim under KRS 342.316 and KRS 342.730. In order to recover, that employee must prove causation and impairment to earning capacity, to be eligible for payment pursuant to KRS 342.730. The coal worker, on the other hand, receives the benefit of an irrebuttable presumption of total, permanent disability. Whether actually functionally impaired or not, the coal worker need prove nothing.

The technical medical data cited in the majority opinion as legislative fact speaks only to the radiographic classification of various categories of *all* pneumoconioses. It adds nothing to the argument that a distinction based on the source of the disease is proper according to § 59 criteria.

The majority's "economic impact" rationale relating to depletion of the Special Fund by the sheer number of claims on behalf of coal industry workers, also fails to support this classification. In *Gillis, supra,* we stated that "size alone does not constitute a reason for classification unless that size produces other *qualitative* differences related to the purpose of the classification. *Id.* at 364 (emphasis added) (quoting *Bd. of Educ. of Jefferson Co. v. Bd. of Educ. of Louisville,* Ky., 472 S.W.2d 496, 498 (1971)). While the majority would like to convince otherwise, any difference the size of the coal industry makes, relating to the purpose of this classification, is purely *quantitative.*

Individual workers with pneumoconiosis stand in the same relationship to the law whether they hail from the coal mine or the ostrich cage. If the environmental source of their pneumoconioses has no qualitative bearing on any aspect of the illness itself, then neither should it impact the law that governs compensation for it.

While this dissent has focused on the unconstitutionality of KRS 342.732(1)(d) with respect to its effect on the disabled employee, the logic herein applies just as forcefully (if not more) to the employer of workers with pneumoconiosis. The statute severs a natural class of employers, too. It leaves intact the ability of the non-coal employer to defend against claims for benefits with credible medical evidence. Not so for the employer of the coal worker. What operates as a non-stop ticket to total, permanent disability status for coal workers turns out to be an irrebuttable red light for their employers. To deprive only part of this class of the opportunity to be heard and defend against liability not only violates § 59, but may violate other constitutional provisions as well. If legislative policy says the buck should stop with the coal employers, it should not be based on a distinction without a real difference, and it should not be at the courtroom door.

KRS 342.732(1)(d) obviously was not intended to be special legislation. I cannot disagree with the logic underlying its enactment. But the legislature must find a way to classify that meets the criteria of § 59 of our constitution, or devise an across-the-board solution to the Special Fund problem. Until it does, I am of the opinion that the statute is unconstitutional, and should be treated by this Court as just that.

LEIBSON and SPAIN, JJ., join in this dissent.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

First of all, I dissent for the reasons stated by Chief Justice Stephens' dissent regarding violation of Kentucky Constitution §§ 59 and 60.

Further, I dissent because the statute in question violates Kentucky Constitution § 2, which states:

"Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

A statute mandating a disability award of 100% for x-ray findings in a condition which is not necessarily disabling, is unconstitutionally arbitrary. The medical evidence here is that while a person with such findings should be advised to cease working in the mines,

such a person is not 100% disabled for other work.

A conclusive presumption mandated by the General Assembly makes a question of fact (disability in fact) a matter of law. This law provides total disability benefits to coal workers simply because they have certain x-ray findings, and further does so to the exclusion of other workers with the same condition. All of the "legislative findings" in the world cannot turn wine into blood, or make x-ray finding conclusive proof of total disability, when the medical evidence says otherwise.

Proof of disability in *fact* is the only statutory criterion the General Assembly can use in awarding benefits to coal miners without being unconstitutionally arbitrary in setting the disability standard. *Cf. Tabler v. Wallace,* Ky., 704 S.W.2d 179 (1985).

STEPHENS, C.J., joins this dissent.