Kelly D. GIBBS, Appellant,

v.

PREMIER SCALE COMPANY/INDIANA SCALE COMPANY; Donald G. Smith, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2000–SC–0205–WC.

Supreme Court of Kentucky.

March 22, 2001.

As Modified on Denial of Rehearing Aug. 23, 2001.

Eric R. Collis, Lynch, Cox, Gilman, & Mahan, P.S.C., Louisville, for Appellant.

Thomas L. Ferreri, Hon. Brian Gannon, Kamp T. Purdy, Ferreri & Fogle, Louisville, for Appellee Premier Scale Co.

## OPINION OF THE COURT

This workers' compensation appeal concerns whether the claimant demonstrated that he sustained a harmful change in the human organism which was evidenced by objective medical findings. KRS 342.0011(1). The meaning of the term "objective medical findings," as it is defined by KRS 342.0011(33), is a matter of first impression.

The claimant was born in 1939 and had an extensive employment history when he began working for the defendant-employer in 1984, inspecting, repairing, and installing all types of scales. Over the years, he had sustained work-related injuries and had undergone cervical, kneecap, and shoulder surgery. Those claims were settled for permanent, partial disabilities totaling 53.75%. He had a medical history of

noninsulin-dependent diabetes and of taking Lorazipam, a nerve medication.

On December 23, 1996, while the claimant was driving to a work assignment, his vehicle was struck by another vehicle in the driver's door. The claimant testified that he recalled the collision, itself, but that he did not remember getting out of the truck. He testified, "When I come to, I was laying on the sidewalk." He was taken by air ambulance to the University of Louisville Hospital. Emergency room records indicated that he complained of head and upper back pain. The clinical impression was of a closed head injury post motor vehicle accident. The claimant testified that he was kept in the hospital for several hours for observation, during which time he passed in and out of consciousness.

On December 26, 1996, the claimant presented at the emergency room of the Caritas Medical Center. He complained of dizziness and headache since the accident and of pain in the neck, right shoulder, and lower back. A neurological examination indicated that he was slightly ataxic but revealed no other deficit.[1] A CT scan of the head was interpreted as being normal, although it did show some evidence of chronic sinusitis. X-rays of the cervical spine showed some degenerative changes, and x-rays of the lumbar spine and of the right shoulder were normal.

The claimant was seen by Dr. Seifer, a neurologist, on January 8, 1997, at which time he complained of pain in his head, neck, back, and legs. He also complained of difficulty sleeping, slurred speech, blurred vision, and unsteadiness. Dr. Seifer examined the claimant, took a medical history, and performed an EEG which was normal. He concluded that the claimant's history and symptoms were compatible with a post-concussive syndrome as a result of the December 23, 1996, accident. Several months later, the claimant complained of nightmares and occasional hallucinations for which Dr. Seifer recommended a psychiatric evaluation. After following the claimant for nearly a year, Dr. Seifer remained of the opinion that he suffered from post-concussive syndrome.

In explaining the diagnosis, Dr. Seifer testified that postconcussive syndrome is well documented in the medical literature and refers to a group of symptoms which are common in patients who have suffered head trauma. The most common symptoms include headaches, visual disturbances, hearing disturbances, sleep problems, memory problems, personality changes, and various physiological changes. Symptoms may wax and wane over time, with some individuals recovering very quickly and others never recovering. A period of unconsciousness is not imperative for the diagnosis but is considered to be significant.

Dr. Seifer testified that although the claimant had the requisite symptoms, there was a lack of any definitive, observable physical finding of the condition. The diagnostic testing which had been performed was essentially normal. However, Dr. Seifer did not find that to be surprising. He also indicated that the degree and duration of symptoms does not necessarily reflect the severity of the underlying physical injury. Dr. Seifer testified that, in practice, the diagnosis is made on the basis of a history of head trauma and reported symptoms.

Addressing the lack of purely objective evidence of the underlying injury, Dr. Seifer testified that certain changes in the brain which occur with trauma are discern-

---

1. *Stedman's Medical Dictionary,* 5th Lawyers' Edition, defines ataxia as being an "inability to perform coordinated muscular movements."

able only by means of a different level of analysis than is currently used in medical practice. He explained that studies have demonstrated that head trauma causes micro-shearing of brain tissue, with tearing of certain brain cells and connective tissue within the brain. Autopsies of the brains of patients who sustained head injuries but died of another cause revealed clear pathological changes in the brain on a cellular level. There was clear evidence that head trauma caused biochemical changes within the brain, that it caused changes in the brain chemistries of sodium, potassium, magnesium, and calcium, and that it affected neurotransmission. A recent study detected changes in regional blood flow following head trauma. More specifically, it detected reduced cerebral blood flow and regional and hemispheric asymmetries which supported an organic basis for chronic posttraumatic headache. However, Dr. Seifer indicated that although MRI, EEG, CT scan and similar presently-used diagnostic tools can detect some types of brain damage, they are incapable of detecting these types of changes.

Dr. Seifer testified that he had prescribed Elavil, a drug which affects serotonin pathways in the brain and which is used to treat pain, particularly headache. However, in his opinion, the claimant needed more aggressive psychological and/or psychiatric treatment; therefore, he had made a psychiatric referral. He had referred the claimant to an opthamology practice for further evaluation of his vision problems and had recommended additional treatment for the neck problem which was exacerbated by the accident. When he last saw the claimant, he thought that the claimant would eventually be able perform some type of desk job but could not return to work which required driving, loading, and unloading a truck. Due to the claimant's persistent and disabling symptoms,

Dr. Seifer had not yet released him to return to work.

On referral from Dr. Seifer, the claimant was seen by various members of an opthamology practice. Dr. Mahl, a specialist in vitreo-retinal diseases and surgery, testified that the claimant had diabetic retinopathy, secondary to his diabetes. The condition was not related to the work accident and was treated with laser therapy. Dr. Berman, a specialist in neuro-opthamology, examined the claimant and performed a number of tests in May, 1997, subsequent to the laser therapy. Dr. Berman and Dr. Lowenthal, a specialist in vitreo-retinal diseases, concluded that the blurred vision, which occurred when the claimant tilted or turned his head in a certain position, was secondary to post-concussive syndrome rather than the diabetic condition. In October, 1997, Dr. Murphy reevaluated the claimant with regard to the diabetic retinopathy and noted that the claimant also suffered from a subjective visual disturbance consistent with post-concussive syndrome. Dr. Berman saw the claimant again in February, 1998. He emphasized that the claimant suffered from two separate visual problems, one of which was attributable to post-concussive syndrome. In his opinion, any estimate of the extent to which each problem contributed to the claimant's overall visual condition would be speculative.

Dr. Banerjee, a neurosurgeon, evaluated the claimant in March and December, 1997. In his opinion, the residuals of the accident were "very little." It caused a neck strain, at most, and no permanent impairment. He attributed most of the claimant's symptoms, including diminished reflexes in the upper and lower extremities, to diabetic neuropathy, noting that the condition can result in problems with infection, visual disturbances, and depression. He listed other possible causes of

the blurred vision, headache, and neck pain as being the Elavil, a flexion/extension injury of the neck, prior neck surgery, and arthritis or age-related changes in the neck. On March 5, 1997, he expected the claimant to reach maximum medical improvement (MMI) in about one month.

When deposed, Dr. Banerjee testified that he had treated patients with post-concussive syndrome. He agreed that no objective medical findings were necessary for a diagnosis and that the severity of the head injury was not a factor. He testified that symptoms normally resolved within three to six months, but sometimes they persisted for more than a year. Although he agreed that the claimant's complaints were compatible with post-concussive syndrome, he remained unconvinced that the claimant suffered from the condition. He assigned a 13% impairment rating to the effects of the prior neck surgery.

The claimant testified that he continued to experience problems with headaches, blurred vision, balance, memory, hallucinations, irritability, and avoiding other people. His employer had terminated him, and he did not think he could perform his former work. The claimant's wife testified that since the accident he cries, has a bad temper and mood problems, and has trouble sleeping.

The Administrative Law Judge (ALJ) concluded from the evidence that the claimant had failed to prove that he suffered from a permanent occupational disability due to the neck injury but that he was entitled to medical benefits for the condition. The ALJ determined that the claimant exhibited symptoms of post-concussive syndrome, that he suffered from the condition as a result of the work-related accident, and that he was totally occupationally disabled by the condition.

However, in view of the testimony by Drs. Seifer and Banerjee that a diagnosis of the condition was made on the basis of symptoms rather than objective medical findings, the ALJ concluded that post-concussive syndrome was not an "injury" as the term came to be defined effective December 12, 1996. KRS 342.0011(1) and (33). For that reason, the claimant was entitled to neither income nor medical benefits for the condition. Finally, the ALJ determined that the claimant was entitled to the temporary, total disability (TTD) benefits which had been paid voluntarily by the employer until March 31, 1997.[2]

The claimant petitioned for reconsideration, requesting additional findings of fact with regard to the interpretation of the term "objective medical findings." The petition was overruled, after which he appealed.

The Workers' Compensation Board (Board) was persuaded that the legislature had intended for the term "objective medical findings" to permit the consideration of more than diagnostic medical studies. Referring to statements in the American Medical Association's *Guides to the Evaluation of Permanent Impairment,* the Board concluded that the term "objective medical findings" was intended to embrace the "art" involved in the practice of medicine as well as the science. It viewed the definition as "embrac[ing] medical opinion, if based upon direct observation and grounded upon standardized methods."

Turning to the instant case, the Board noted: 1.) the fact that Drs. Banerjee and Seifer agreed with regard to the standardized method for diagnosing post-concussive syndrome; 2.) the fact that Dr. Seifer had directly observed the claimant and had employed the standardized method in mak-

---

2. On March 3, 1997, Dr. Banerjee had anticipated that in one month the claimant would reach MMI from what he had diagnosed as a temporarily disabling neck strain.

ing his diagnosis; and 3.) the fact that the ALJ was persuaded by the opinion of Dr. Seifer. Based upon the foregoing, the Board concluded that the ALJ had erred by construing the definition of objective medical findings too narrowly. In any event, because the claimant had offered no evidence of an AMA impairment due to post-concussive syndrome, he did not have a disability rating and would not be entitled to income benefits for either permanent, partial or permanent, total disability as defined by KRS 342.0011(11)(b) and (c). The Board noted, however, that a disability rating is not required by KRS 342.0011(11)(a) for an award of TTD. Dr. Banerjee had indicated that the claimant should reach MMI within a month of March 5, 1997; however, Dr. Seifer had not released the claimant to return to work in November, 1997. Therefore, the claim was remanded to the ALJ for further proceedings with regard to the proper duration of TTD.

In a two-to-one decision, the Court of Appeals reversed the Board with regard to the meaning of the term "objective medical findings." As ordered by the Board, the claim was remanded with regard to the question of TTD. The dissent adopted portions of the opinion of the Board. We affirm, although our reasoning differs somewhat from that expressed by the majority of the Court of Appeals panel.

The thrust of the claimant's argument on appeal is that he has suffered a harmful change, that none of the diagnostic testing has ruled out the existence of that harmful change, and that it is the limitations of present-day diagnostic tools which make the change impossible for him to prove except by means of the particular symptoms of which he complains. He asserts that KRS 342.0011(33) refers to information obtained by direct observation and testing, so long as the physician applies objective or standardized methods. He points out that even so-called objective diagnostic tests rely upon a subjective interpretation. He also asserts that if Dr. Seifer's diagnosis of post-concussive syndrome was not supported by objective medical findings, the remand which the Court of Appeals had affirmed would be moot.

The employer maintains that the principles of liberal construction no longer apply with regard to the interpretation of Chapter 342 and that the legislature's goal in amending the definition of "injury" clearly was to take a more conservative approach to compensating the effects of workplace accidents. It asserts that by incorporating a requirement that a harmful change be evidenced by objective medical findings as defined in KRS 342.0011(33), the legislature demonstrated its intent to remove subjectivity and eliminate claims which were based solely upon the claimant's subjective complaints. The employer asserts that the definition requires not only that testing be performed in an objective or standardized method, but also that it must produce information which indicates the presence of a harmful change.

Since December 12, 1996, KRS 342.0011(1) has provided as follows:

"Injury" means any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings. "Injury" does not include the effects of the natural aging process, and does not include any communicable disease unless the risk of contracting the disease is increased by the nature of the employment. "Injury" when used generally, unless the context indicates otherwise, shall include an oc-

cupational disease and damage to a prosthetic appliance, but shall not include a psychological, psychiatric, or stress-related change in the human organism, unless it is a direct result of a physical injury.

It is apparent that, for the purposes of Chapter 342, "injury" is now defined in terms of an event which proximately causes a harmful change rather than in terms of the harmful change, itself. KRS 342.0011(33) provides that:

"Objective medical findings" means information gained through direct observation and testing of the patient applying objective or standardized methods.

We begin our consideration of this matter by calling to mind some of the 1987 amendments to the Act. Prior to 1987, black lung benefits tended to be awarded on an all-or-nothing basis, based upon little more than a diagnosis and the worker's testimony that he had trouble breathing and could no longer perform his previous work. Medical evidence of the extent of the disease or of the affected worker's functional impairment played little, if any, role in the process. There was no uniformity in the type of medical evidence which was introduced from one claim to the next.

In 1987, the legislature enacted KRS 342.732 and amended KRS 342.316 in an attempt to provide more objective standards with regard to both the requisite medical evidence and the level of benefits to be awarded for varying degrees of coal workers' pneumoconiosis. Those standards were based upon the medical realities of the disease. They took into account the category of disease from which the worker suffered, as visible on x-ray, and the extent of the worker's pulmonary impairment due to the inhalation of coal dust, as demonstrated by spirometry. *See Kentucky Harlan Coal Co. v. Holmes,* Ky., 872 S.W.2d 446 (1994). As a result, workers

with the same disease category and/or pulmonary impairment, as demonstrated by the same type of medical evidence, were entitled to receive the same level of benefits pursuant to KRS 342.732. Income benefits were awarded only to those workers who proved: 1.) that they suffered from a significant impairment in pulmonary function due to the inhalation of coal dust as established under the standards set forth in the AMA *Guides to the Evaluation of Permanent Impairment* (*Guides*) or 2.) that they suffered from an advanced category of the disease.

It is clear that in enacting the 1996 amendments to KRS 342.0011(1) and (33) and to KRS 342.730, the legislature sought to incorporate more objective standards for proving other types of workers' compensation claims. Prior to December 12, 1996, "any work-related harmful change in the human organism" was considered to be an injury pursuant to KRS 342.0011(1), and Chapter 342 contained no explicit standard for proving the existence of such a change except for providing that a finding of fact could not be "arbitrary." KRS 342.285. A favorable finding could be based upon a diagnosis which, itself, was based upon nothing more than the worker's self-reporting of symptoms. In such instances, the fact-finder's perception of the workers' credibility became the basis for awarding or not awarding benefits. As effective December 12, 1996, KRS 342.0011(1) requires that a harmful change must be proximately caused by a work-related traumatic event and must be evidenced by "objective medical findings." Since April 4, 1994, the definition of "injury" has expressly excluded a psychological, psychiatric, or stress-related change unless the change is the direct result of a physical injury. Here, the claimant has alleged that certain physical problems, psychological problems, and mental deficits resulted

from trauma to his brain as a result of the accident. The claim turns upon whether those harmful changes were evidenced by objective medical findings.

As the claimant points out, direct observation by a physician necessarily involves the subjective perception of the observer as does the interpretation of an x-ray, CAT scan, or MRI. It is apparent to this Court that much medical testing is affected by subjective factors on the part of the patient, the evaluator, or both. We also are aware that, in recognition of that reality, standards are employed by the medical profession to help reduce the effect of those subjective factors and, thereby, to render the information which is obtained a more objective assessment of the patient's actual condition. For example, ILO standards for interpreting chest x-rays are employed to help reduce the effects of the subjective perception of the reader. *See Kentucky Harlan Coal Co. v. Holmes, supra.* Likewise, the *Guides* recognize that the results of spirometric testing are affected by the degree of the patient's cooperation. For that reason, the greatest of three acceptable spirometric maneuvers is considered to most accurately represent the extent of the patient's actual impairment. *See Newberg v. Wright,* Ky., 824 S.W.2d 843, 845 (1992). Furthermore, the *Guides* set forth standards for determining the extent of a wide variety of functional impairments. The use of standardized methods decreases the extent to which the observation and testing of a patient are affected by subjective factors and, thereby, renders the resulting information a more objective measure of the patient's actual condition. It results in more uniformity from one case to the next.

The term "diagnosis" refers to a physician's perception of the nature and cause of the patient's harmful change. A physician's diagnosis forms a logical basis for treatment and prognosis. *See Dorland's Illustrated Medical Dictionary,* 24th Edition (1965); *Taber's Cyclopedic Medical Dictionary,* 15th Edition (1985). The "art" of diagnosis comes into play in discerning the correct diagnosis from a number of possibilities. Taking note of the symptoms which the patient reports, examining the patient, questioning the patient, observing the patient, and evaluating the significance of the results of objective or standardized testing, all are elements of the art of medical diagnosis. However, medical diagnosis and the requirements of Chapter 342 for proving the existence of a compensable injury are entirely different matters.

■ KRS 342.0011(1) makes it clear that not all work-related harmful changes are compensable. Therefore, we are constrained to conclude that although a worker may experience symptoms and although a physician may have diagnosed a work-related harmful change, the harmful change must be evidenced by objective medical findings as that term is defined by KRS 342.0011(33). Otherwise, it is not compensable as an "injury." KRS 342.0011(1).

■ KRS 342.0011(33) limits "objective medical findings" to information gained by direct observation and testing applying objective or standardized methods. Thus, the plain language of KRS 342.0011(33) supports the view that a diagnosis is not an objective medical finding but rather that a diagnosis must be supported by objective medical findings in order to establish the presence of a compensable injury. The fact that a particular diagnosis is made in the standard manner will not render it an "objective medical finding." We recognize that a diagnosis of a harmful change which is based solely on complaints of symptoms may constitute a valid diagnosis for the purposes of medical

treatment and that symptoms which are reported by a patient may be viewed by the medical profession as evidence of a harmful change. However, KRS 342.0011(1) and (33) clearly require more, and the courts are bound by those requirements even in instances where they exclude what might seem to some to be a class of worthy claims. A patient's complaints of symptoms clearly are not objective medical findings as the term is defined by KRS 342.0011(33). Therefore, we must conclude that a diagnosis based upon a worker's complaints of symptoms but not supported by objective medical findings is insufficient to prove an "injury" for the purposes of Chapter 342.

In view of the evidence which was presented in this particular case, a question has arisen concerning whether a harmful change must be, or is capable of being, documented by means of sophisticated diagnostic tools such as the x-ray, CAT scan, EEG, or MRI in order to be compensable. Contrary to what some have asserted we are not persuaded that it must. Furthermore, at least to some extent, we view that question as being off the mark. Likewise, we are not persuaded that a harmful change must be both directly observed and apparent on testing in order to be compensable as an injury.

In the instant case, the claimant has focused upon the shortcomings of the sophisticated diagnostic tools. However, in addition to testing which utilizes the aforementioned diagnostic tools, a wide array of standardized laboratory tests and standardized tests of physical and mental function is available to the medical practitioner. Although there may not be a standardized test which would apply to every conceivable symptom of which a patient might complain, or every symptom which cannot be directly observed, such tests are capable of confirming the existence and extent of a number of symptoms. We know of no reason why the existence of a harmful change could not be established, indirectly, through information gained by direct observation and/or testing applying objective or standardized methods that demonstrated the existence of symptoms of such a change. Furthermore, we know of no reason why a diagnosis which was derived from symptoms that were confirmed by direct objective and/or testing applying objective standardized methods would not comply with the requirements of KRS 342.0011(1).

Although the amendments which are at issue clearly have made the requirements for proving a claim for occupational injury more stringent, we are not persuaded that the claimant was faced with an impossible task. Dr. Seifer did not testify concerning whether he observed anything that would confirm the existence of any of the symptoms that the claimant reported. Although standardized methods of testing may not have been available with regard to all of his symptoms, such methods were available to confirm the existence and severity of a number of the reported symptoms and also to assess the likely extent of symptom magnification and malingering. Information gained through standardized psychological testing is commonly introduced in workers' compensation claims to demonstrate both the existence and severity of a wide variety of psychological symptoms and mental deficits. Dr. Seifer referred the claimant to a psychiatrist for the evaluation and treatment of his psychological symptoms. There is evidence that the claimant received some pastoral counseling. However, there is no indication that he sought the psychiatric treatment which Dr. Seifer recommended or that he underwent a standardized psychological or psychiatric assessment with regard to the hallucinations, emotional prob-

lems, personality changes, or memory problems which he alleged.

In the process of determining that some of the claimant's visual problems were attributable to post-concussive syndrome rather than to diabetic retinopathy, Drs. Berman and Lowenthal performed a number of tests on his eyes which may or may not have formed at least some of the basis for their diagnosis. However, nothing in their reports indicates as much. Furthermore, nothing indicates that they observed anything that would confirm the existence of the visual symptoms of which the claimant complained. There was some evidence that the claimant was slightly ataxic when he sought emergency room treatment at Caritas, and he complained of unsteadiness to Dr. Seifer. However, there is nothing in Dr. Seifer's testimony which indicates that his observation or neurological testing documented problems with the claimant's balance or coordination.

■■ The claimant bears the burden of proof and risk of nonpersuasion before the fact-finder with regard to every element of a workers' compensation claim. *Wolf Creek Collieries v. Crum*, Ky.App., 673 S.W.2d 735 (1984); *Snawder v. Stice*, Ky. App., 576 S.W.2d 276 (1979); *Roark v. Alva Coal Corporation*, Ky., 371 S.W.2d 856 (1963). The work-related trauma may, indeed, have caused the claimant to sustain a harmful change to his brain which manifested itself in the form of various symptoms, the aggregate of which is referred to by the medical profession as "post-concussive syndrome." However, he failed to offer direct evidence of the harmful change in the form of objective medical findings. Furthermore, he failed to offer indirect evidence of the harmful change in the form of objective medical findings which demonstrated the existence of symptoms of the change. Under those circumstances, the claimant failed to offer substantial evidence of a harmful change to his brain as a result of the traumatic accident pursuant to the standards set forth in KRS 342.0011(1) and (33).

The decision of the Court of Appeals is affirmed.

COOPER, JOHNSTONE, KELLER, STUMBO, and WINTERSHEIMER, JJ., concur.

LAMBERT, C.J., dissents by separate opinion in which GRAVES and STUMBO, JJ., join.

LAMBERT, Chief Justice, dissenting.

Respectfully, I dissent. In my opinion, the Workers' Compensation Board was correct in its conclusion that the term "objective medical findings" was intended by the legislature to include a medical diagnosis which was based upon direct observation and which was made using standardized methods. For that reason, I would reverse.

In adopting the definition of "injury" which is contained in KRS 342.0011(1) the legislature provided that a diagnosis of a harmful change must be supported by "objective medical findings." KRS 342.0011(33) provides that:

"Objective medical findings" means information gained through direct observation and testing of the patient applying objective or standardized methods.

In my opinion, it is significant that KRS 342.0011(1) requires "objective medical findings" rather than "objective medical evidence." In view of this choice of words, I am persuaded that the legislature did not intend to require that the diagnosis of a harmful change must be supported by diagnostic medical studies.

Even the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (*Guides* ) discusses the

crucial role which the "art" of medicine plays in the practice of medicine, stating as follows:

The physician's judgment and his or her experience, training, skill, and thoroughness in examining the patient and applying the findings to *Guides* criteria will be factors in estimating the degree of the patient's impairment. These attributes compose part of the 'art' of medicine, which, together with a foundation in science, constitute the essence of medical practice. The evaluator should understand that other considerations will also apply, such as the sensitivity, specificity, accuracy, reproducibility, and interpretation of laboratory tests and clinical procedures, and variability among observers' interpretations of the tests and procedures. (p. ⅓, AMA *Guides*, 4th Edition)

The legislature has placed great reliance upon the *Guides* when drafting Chapter 342. In view of the value which the *Guides* clearly place on the art of medicine as well as the science of medicine, I am persuaded that the definition of "objective medical findings" was intended to embrace a diagnosis which was reached through direct observation and grounded upon standardized methods as well as a diagnosis which was reached through direct observation and diagnostic testing.

In the instant case, Drs. Banerjee and Seifer agreed with regard to the standardized method for diagnosing post-concussive syndrome. After evaluating the claimant in March and December, 1997, Dr. Banerjee was not persuaded that the claimant suffered from the condition. In contrast, Dr. Seifer, the treating physician, directly observed the claimant, employed the standardized method for making a diagnosis, and concluded that the claimant did suffer from the condition. The ALJ was persuaded by the opinion of Dr. Seifer. In view of the foregoing, the evidence compelled a finding that the claimant suffered an "injury" as defined by KRS 342.0011(1).

GRAVES and STUMBO, JJ., join this dissenting opinion.