COMMONWEALTH of Kentucky; Chris Gorman, as Attorney General of Kentucky; Paul F. Isaacs, as Secretary of the Justice Cabinet; Division of Charitable Gaming of the Kentucky Justice Cabinet; Chris Johnson, as Director of the Division of Charitable Gaming; and Nicholas N. King, as Commonwealth Attorney for the 30th Judicial District, Appellants,

v.

LOUISVILLE ATLANTIS COMMUNITY/ADAPT, INC.; USO of Kentucky, Inc.; Daughters of Jerusalem, Inc.; Willa Mae Council Housing Corporation; Spirit of Peace Missionary Baptist Church, Inc.; Reverend R. Z. Miller; and Foster V. Jones, Jr.; Dupont Manual High School Alumni Association, Inc.; Dupont Manual High School Alumni Athletic Auxiliary; Jonathan Creek Rod & Gun Club, Inc.; the Jonathan Creek Rod & Gun Club Scholarship Auxiliary, Appellees.

Foster V. JONES, Jr.; Dupont Manual High School Alumni Association, Inc.; Dupont Manual High School Alumni Athletic Auxiliary; Jonathan Creek Rod & Gun Club, Inc.; The Jonathan Creek Rod & Gun Club Scholarship Auxiliary; USO of Kentucky, Inc.; Daughters of Jerusalem, Inc.; and Willa Mae Council Housing Corporation, Cross–Appellants,

v.

COMMONWEALTH of Kentucky, Chris Gorman, as Attorney General of Kentucky; Paul F. Isaacs; as Secretary of the Justice Cabinet; Kentucky Justice Cabinet; Division of Charitable Gaming of the Justice Cabinet; Chris Johnson, as Director of the Division of Charitable Gaming; and Nicholas King, as Commonwealth Attorney for the 30th Judicial District, Cross/Appellees.

Nos. 95–CA–2787–MR, 95–CA–3087–MR.

Court of Appeals of Kentucky.

Sept. 19, 1997.

Rehearing Denied Nov. 14, 1997.

Discretionary Review Denied by Supreme Court June 10, 1998.

A.B. Chandler, III, Attorney General, Robert V. Bullock, Assistant Attorney General, Frankfort, for Appellants/Cross–Appellees.

Foster V. Jones, Jr., Louisville, pro se.

Michael L. Allen, Louisville, for Appellees/Cross–Appellants.

Before BUCKINGHAM, HUDDLESTON and KNOPF, JJ.

BUCKINGHAM, Judge.

Various charitable organizations filed declaratory judgment actions, which were consolidated, in the Jefferson Circuit Court to determine the constitutionality of various portions of the Charitable Gaming Act (KRS 238.500 -.995).[1] The trial court found parts of the Act constitutional and other parts unconstitutional. Having considered the arguments of counsel and the applicable authorities, we affirm in part and reverse in part.

Lotteries and gift enterprises historically have been forbidden in this Commonwealth. However, the Kentucky Constitution was amended in 1988 to allow the General Assembly to establish a state lottery and was amended again in 1992 to allow the General Assembly to permit charitable lotteries and charitable ·gift enterprises. Ky. Const., § 226. In response to the 1992 amendment, the General Assembly passed the Charitable Gaming Act in 1994, which set forth a comprehensive scheme for the conduct, oversight, and regulation of charitable gaming. The constitutionality of various portions of the Act are at issue herein.

■ The first issue concerns the constitutionality of KRS 238.570(1) which imposes a fee on charitable gaming in the amount of one-half of one percent of the gross receipts derived from all charitable gaming conducted by charitable organizations required to be licensed in the Commonwealth. Section 226(2)(d) of the Kentucky Constitution states that

[t]he General Assembly may by general law permit charitable lotteries and charitable gift enterprises and, if it does so, it shall:

. . . .

(d) Provide for means of accounting for the amount of money raised by lotteries and gift enterprises and for assuring its expenditure only for charitable purposes[.]

The trial court reasoned that the fee uses money raised from charitable gaming for regulatory purposes and not for charitable purposes as required by § 226 and is, therefore, in violation thereof. We disagree.

Section 226(2)(f) of the Kentucky Constitution provides that

1. The charitable organizations are not asking that the statute be declared unconstitutional in its entirety.

[t]he General Assembly may by general law permit charitable lotteries and charitable gift enterprises and, if it does so, it shall:

. . . .

(f) Pass whatever other general laws the General Assembly deems necessary to assure the proper functioning, honesty, and integrity of charitable lotteries and charitable gift enterprises, and the charitable purposes for which the funds are expended.

Under this section, the General Assembly has the authority to pass laws that it deems necessary to assure the proper functioning of charitable gaming, including the regulatory fee set forth in KRS 238.570(1).

■ Furthermore, we interpret § 226(2)(d), which provides that money raised by charitable gaming be expended only for charitable purposes, as requiring only that net proceeds be expended only for charitable purposes. KRS 238.550(3) allows charities engaged in gaming to spend funds on such things as rent, utilities, insurance, advertising, and security services. It would be illogical for the General Assembly to be constitutionally permitted to designate that charities can spend funds for those noncharitable purposes listed in KRS 238.550(3), but could not constitutionally designate that the same charities may spend a portion of the gross receipts for a regulatory fee.

■ The trial court also ruled that KRS 238.570(1) is in violation of § 170 of the Kentucky Constitution. That section provides, in relevant part, that "[t]here shall be exempted from taxation . . . institutions of purely public charity, . . . and the income of such property as is used exclusively for their maintenance. . . ." The trial court reasoned that the fee was actually an unconstitutional tax on charitable organizations. Again, we disagree.

■ Quoting from other authorities, the Court in *Gray v. Methodist Episcopal*

*Church*, 272 Ky. 646, 114 S.W.2d 1141 (1938), held as follows:

[S]ince a tax is a charge imposed for the purpose of raising revenue, a charge primarily imposed for the purpose of regulation is not a tax, and is not subject to the constitutional limitations upon the power of taxation. . . . If the primary purpose of the legislature in imposing such a charge is to regulate the occupation or the act, the charge is not a tax even if it produces revenue for the public.

*Id.* at 652, 114 S.W.2d at 1144. Further, "[a] tax is universally defined as an enforced contribution to provide for the support of government, whereas a fee is a charge for a particular service." *Long Run Baptist Ass'n v. Sewer Dist.*, Ky.App., 775 S.W.2d 520, 522 (1989). The funds generated from the fee imposed pursuant to KRS 238.570(1) are kept in a separate account and are expended by the Charitable Gaming Division only in the administration and enforcement of the provisions of the Charitable Gaming Act. The fee is a regulatory fee and not a tax.[2]

The charitable organizations also argue that the fee imposed by KRS 238.570(1) violates § 171 of the Kentucky Constitution. In relevant part, that section provides that "[t]axes shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax. . . ." However, since we have determined that the fee is not a tax, this argument is without merit.

The fee imposed by KRS 238.570(1) is constitutional, and the ruling of the trial court to the contrary is reversed.

■ The next issue is whether the tipping of a volunteer charitable gaming worker is lawful. KRS 238.540(4), as adopted in 1994, states in part that "[n]o person engaged in the conduct and administration of charitable gaming shall receive any compensation for services related to the charitable gaming activities[.]" The position of the Commonwealth is that this prohibition

---

**2.** Since we hold that the fee imposed under KRS 238.570(1) is a regulatory fee and not a tax, then the issue of whether § 170 of the Kentucky Constitution applies only to ad valorem taxes is moot. We note, however, that it was held in *Gillis v. Yount*, Ky., 748 S.W.2d 357, 358 (1988), that §§ 170–175 of the Kentucky Constitution deal only with the power to tax property, or ad valorem taxes.

against compensating workers includes tipping. The issue has now been settled by the General Assembly's amending of KRS 238.540(4) in 1996 to explicitly prohibit tipping. The trial court's ruling that tipping is legal is therefore reversed.

The remaining constitutional challenges to the Charitable Gaming Act raised by the charitable organizations were rejected by the trial court. Each will be reviewed herein.

KRS 238.500 states in part as follows:

The General Assembly of the Commonwealth of Kentucky hereby declares that charitable gaming conducted by charitable organizations is an important method of raising funds for legitimate charitable purposes and is in the public interest.... The intent of this chapter is to prevent the commercialization of charitable gaming, to prevent participation in charitable gaming by criminal and other undesirable elements, and to prevent the diversion of funds from legitimate charitable purposes.

Section 226 of the Kentucky Constitution gave the General Assembly the authority to permit charitable gaming and to pass general laws to assure its proper functioning, honesty, and integrity. The charitable organizations argue that KRS 238.500 (which states in part that one intent of the Act is to prevent the commercialization of charitable gaming) is vague, arbitrarily imposed, and overbroad. In fact, it is none of these.

■ A statute is impermissibly vague when a person disposed to obey the law could not determine with reasonable certainty from the language used that a contemplated conduct would amount to a violation. *Commonwealth v. Foley*, Ky., 798 S.W.2d 947, 951 (1990). Because KRS 238.500 does not itself prohibit any conduct, the vagueness argument has no applicability.

■ Section 2 of the Kentucky Constitution prohibits the arbitrary exercise of power by state government by stating that

"[a]bsolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." In order to pass constitutional muster in this regard, a statute must be rationally related to a legitimate state objective. *Lost Mountain Mining v. Fields*, Ky. App., 918 S.W.2d 232, 233 (1996). Charitable gaming is an exception to the constitutional prohibition against lotteries and gift enterprises. Since the state may prohibit gambling entirely, it may clearly put limits on charitable gaming which may not be put on other legitimate enterprises. Keeping charitable gaming from becoming commercial, preventing participation by criminals, and preventing the diversion of funds from legitimate charitable purposes are all legitimate state objectives. The statute is not an arbitrary exercise of state power.

■ Likewise, KRS 238.500 is not overbroad. "A challenge for overbreadth must fail unless the law prohibits a substantial amount of constitutionally protected conduct." *Natural Resources and Environmental Protection Cabinet v. Kentucky Harlan Coal Co.* (hereinafter "Kentucky Harlan Coal"), Ky.App., 870 S.W.2d 421, 424 (1993). As charitable gaming is not constitutionally protected conduct, the statute is not overbroad.

■ The charitable organizations next contend that KRS 238.505 limits participants in various games to the use of paper cards, paper tickets, or paper sheets. They claim that limiting the use to paper is vague, arbitrary, and overbroad. They argue that the statute disallows the use of computers or electronics in charitable gaming. However, the statute in question merely defines the terms to be used in the rest of the Act and even provides that these definitions do not apply if "the context requires otherwise." The statute does not limit participants in charitable gaming to the use of paper.[3]

KRS 238.530(3) states as follows:

Keno, a game employing computers. Regardless, there is a rational basis related to a legitimate state interest in that electronic gaming devices create a higher risk of manipulation by players, distributors, and manufacturers. *See* Affidavit of Director of the Division of Charitable

---

**3.** KRS 238.505 was amended in 1996, after the trial court's order was entered. KRS 238.505(2) now states that "[c]haritable gaming shall not include ... electronic video gaming devices...." However, the Division of Charitable Gaming also established a regulation in 1996 concerning

No person who is licensed as a charitable organization or a charitable gaming facility shall be eligible for licensure as a distributor or manufacturer. No person who is a licensed wholesaler or distributor of alcoholic beverages shall be licensed as a distributor or manufacturer. No person who is licensed as a distributor shall be licensed as a manufacturer, and no person licensed as a manufacturer shall be licensed as a distributor.

The charitable organizations contend that the statute is unconstitutional as overbroad and in violation of § 2 of the Kentucky Constitution. As we noted previously herein, a statute is not overbroad unless it prohibits a substantial amount of constitutionally protected conduct. *Kentucky Harlan Coal, supra*, at 424. As there is no constitutional right to engage in charitable gaming, the charitable organizations have failed to identify any kind of constitutionally protected conduct upon which KRS 238.530 would infringe. Therefore, their constitutional challenge that the statute is overbroad must fail.

■ Furthermore, KRS 238.530(3) does not violate § 2 of the Kentucky Constitution as an arbitrary exercise of state power. As indicated in the affidavit of the Director of the Division of Charitable Gaming, the rational basis behind this statute is to avoid commingling of duties and to insure that charitable gaming is not controlled by one type of licensee, resulting in more separate source records for regulatory review and thus more access to information. Thus, KRS 238.530(3) is constitutional.

■ The charitable organizations also challenge the constitutionality of portions of KRS 238.535. Section 238.535(1) exempts from the licensing requirement any charitable organization whose gross receipts do not exceed $5,000 a year but imposes strict limitations on other charitable organizations with higher gross receipts. The charitable organizations argue that the statute violates § 2 of the Kentucky Constitution as an arbitrary exercise of power. However, "[t]he constitutionality of a statute will be upheld if its classification is not arbitrary, or if it is found-ed upon any substantial distinction suggesting the necessity or propriety of such regulation." *Kentucky Harlan Coal Co. v. Holmes* (hereinafter "Holmes"), Ky., 872 S.W.2d 446, 455 (1994). This portion of the statute is "founded upon a substantial distinction" as the legislature has apparently determined that an organization's charitable gaming does not present the more substantial risks presented by larger charitable gaming enterprises when the gross receipts are below the annual threshold amount. KRS 238.535(1) is constitutional.

KRS 238.535(8)(b) requires that a charitable organization operate continuously within the Commonwealth for charitable purposes for a period of three years prior to application for licensure. KRS 238.535(8)(c) states that a charitable organization must have been actively engaged in charitable activities during the three years immediately prior to such application and be able to demonstrate reasonable progress in accomplishing its charitable purposes during this period. KRS 238.535(8)(d) states that a charitable organization must have maintained an office or place of business or operation, other than for the conduct of charitable gaming, for one year in the county in which the charitable gaming is to be conducted in order to qualify for licensure. The charitable organizations maintain that these are unconstitutional restrictions on the ability to conduct charitable bingo.

■ The charitable organizations challenge the residency requirement in KRS 238.535(8)(b) as being in violation of the commerce clause of the U.S. Constitution. However, since the record indicates that all charitable organizations herein have been established in Kentucky for more than three years prior to filing their applications for licensure, they lack standing to do so. "Before one seeks to strike down a state statute he must show that the alleged unconstitutional feature injures him." *Second Street Properties, Inc. v. Fiscal Court of Jefferson County*, Ky., 445 S.W.2d 709, 716 (1969). Furthermore, "[t]he assertion of one's own legal rights and interests must be demonstrated and the claim to relief will not rest

Gaming. Thus, requiring the use of paper would

not be unconstitutional.

upon the legal rights of third persons." *Associated Industries of Kentucky v. Commonwealth*, Ky., 912 S.W.2d 947, 951 (1995).

■ We find no merit to the charitable organizations' constitutional challenge to KRS 238.535(8)(c). The Commonwealth has a legitimate interest in insuring that charitable gaming receipts are benefitting only organizations which are actively involved in charitable works. This interest is rationally related to the requirement that only organizations which have been performing charitable works for three years may be licensed. *Fields, supra.* Furthermore, the three-year threshold is not unreasonable.

■ There is likewise no merit to the charitable organizations' constitutional challenge to KRS 238.535(8)(d). The Commonwealth has a legitimate state objective in preventing illegitimate, "fly-by-night" organizations from running charitable gaming operations. Requiring that an organization must have maintained an office or place of business or operation, other than for the conduct of charitable gaming, for one year in the county in which the charitable gaming is to be conducted in order to qualify for licensure is rationally related to that objective. *Fields, supra.*

■ KRS 238.540(1) provides that "[c]haritable gaming shall be conducted by a licensed charitable organization at one (1) location which shall be stated on the license." The charitable organizations contend that this statute is unconstitutional as an arbitrary and unreasonable restriction. However, the statute clearly is rationally related to the legitimate state interest in monitoring charitable gaming operations and enforcing the Charitable Gaming Act. Limiting an organization's charitable gaming to one location allows better monitoring and enforcement of the laws. It is a valid exercise of the state's police power.[4]

■ KRS 238.540(4) requires that charitable gaming shall be conducted and administered solely by officers, members, and bona fide employees of the licensed charitable organization and that no person engaged in the conduct and administration of charitable gaming shall receive any compensation for services related to the charitable gaming activities.[5] This restriction is rationally related to the Commonwealth's legitimate interest in insuring that charitable gaming does not become a commercial enterprise (resulting in profits to individuals), but remains purely a fund-raising opportunity to further charitable works.[6] As for the argument of the charitable organizations that KRS 238.540(4) is facially overbroad, they again fail to identify a constitutionally protected right which is threatened by this legislation. Thus, the argument fails. *Kentucky Harlan Coal, supra.*

■ The charitable organizations also attack the constitutionality of KRS 238.540(5) which provides that

[n]o licensed charitable organization shall contract with, or otherwise utilize the services of, any management company or consultant in managing or conducting charitable gaming.

The organizations argue that their organizations are too small to conduct charitable gaming efficiently without the aid of consultants or management companies. Nonethe-

---

4. Similar statutes imposing time and place restrictions on charitable gaming have been held constitutional in other states. *See* e.g., *Joseph Bros. Co. v. Brown*, 65 Ohio App.2d 43, 415 N.E.2d 987, 993 (1979) (upholding a statute providing that a bingo hall may be used by only two organizations per week); *Durham Council of the Blind v. Edmisten*, 79 N.C.App. 156, 339 S.E.2d 84, 87 (1986) (upholding a statute restricting charitable organizations from conducting more than two bingo sessions per week).

5. KRS 238.540(4) was amended in 1996. It now allows the use of volunteers but requires that they be readily identifiable as volunteers. In addition, tipping is now explicitly prohibited.

6. Other states have upheld laws prohibiting paid charitable gaming employees, based on similar charitable gaming statutes which allow gaming that is not to operate for any individual's profit but for charity fund-raising. *See State v. Johnston*, 56 Or.App. 849, 643 P.2d 666, 668 (1982) (upholding conviction of organization for paying members to conduct bingo games); *Brown v. Marine Club, Inc..* 51 Ohio Misc. 51, 365 N.E.2d 1277, 1282–83 (1976) (holding that the defendants would no longer be able to pay workers to conduct charitable game).

less, this restriction is clearly rationally related to the state's legitimate interest in preventing the commercialization of charitable gaming and in insuring that the funds raised in such games are not diverted from legitimate charitable purposes. Thus, the statute is not an unconstitutional arbitrary exercise of power by state government.

▆▆▆▆ The charitable organizations further argue that subsections (4) and (5) of KRS 238.540 constitute "special legislation" in violation of § 59 of the Kentucky Constitution. They allege that these rules favor large charities such as Catholic schools and churches whose bingo enterprises are so well-established that management companies or consultants are not necessary, and who have a ready supply of members and employees to help out. However, the fact that the legislature deals with a special subject (such as charitable gaming) does not necessarily make it special legislation. "A general law applies to persons or things as a class, while a special law relates to particular persons or things of a class[.]" *Commonwealth, Revenue Cabinet v. Smith,* Ky., 875 S.W.2d 873, 877 (1994). KRS 238.540 defines a class of charitable organizations which may qualify for a charitable gaming license. The charitable organizations herein and the Catholic charities are parts of the same class. KRS 238.540(4) and (5) do not relate only to particular members of the class, but apply equally to the whole class. No member of the class may hire employees to conduct charitable gaming or hire a management company or consultant.

The charitable organizations also challenge the constitutionality of KRS 238.540(6).[7] They allege that the statute unconstitutionally requires that gaming supplies be purchased from Kentucky distributors. The statute actually states "[a] licensed charitable organization shall not purchase charitable gaming supplies and equipment from any person not licensed as a distributor in the Commonwealth of Kentucky." There is no requirement that the distributor must be located in Kentucky; the statute only requires that distributors be licensed in Kentucky. In fact, the legislature specifically contemplated that nonresidents may be licensed as distributors. *See* KRS 238.530(4)(f), requiring nonresident distributors to furnish the division of charitable gaming with the name, address, and phone number of a registered agent within the Commonwealth.

In short, all challenged portions of KRS 238.540 are constitutional.

▆▆▆ The charitable organizations challenge the constitutionality of KRS 238.545 as unreasonable and arbitrary. They particularly object to KRS 238.545(1) which limits charitable gaming sessions to one gaming session per week[8], and KRS 238.545(2) which limits the amount of individual prizes. They argue that these limits will not allow them to compete effectively with the Kentucky Lottery or Indiana river boats.

Nonetheless, these limits are clearly a valid exercise of the state's police power as there is a rational relation between this legislation and the state's legitimate interest in insuring that the games remain charitable, rather than commercial, enterprises. These restrictions are constitutional, since they are reasonably necessary for accomplishing the objectives identified in KRS 238.500 and are not unduly oppressive upon the regulated entities. *Kentucky Cent. Life Ins. Co. v. Stephens,* Ky., 897 S.W.2d 583, 591 (1995).

▆▆▆ The charitable organizations next challenge the constitutionality of various provisions of KRS 238.550. KRS 238.550(1) requires that gross receipts from charitable games be handled only by bona fide officers or employees of the organization.[9] They argue that this restriction unfairly discriminates against small charities. This is economic regulation which is rationally related to the legitimate state interest in insuring that funds raised by charitable gaming are

---

7. This statute was formerly numbered as KRS 238.540(7) at the time this case was pending before the trial court. It has since been renumbered as KRS 238.540(6).

8. The statute was amended in 1996 to allow two five-hour sessions per week, for a total of ten hours per week.

9. Under the 1996 amendment, volunteers may also handle gross receipts.

actually applied to charitable works, rather than being spent on undue administrative costs. Furthermore, limiting the number of people who may handle funds insures accountability. KRS 238.550(1) is constitutional.

The charitable organizations also attack the constitutionality of KRS 238.550(4).[10] This provision requires that licensed charitable gaming organizations do not pay over market rate for a number of listed expenses, including supplies and equipment, rent, etc., as well as the catch-all definition of "[a]ny other expenses the division may determine by administrative regulations to be legitimate." Their main argument in this regard is that they should be allowed to hire management companies and consultants and employees to work charitable gaming events. We have addressed this argument previously, and it merits no additional discussion.

■ The organizations also contend that they are discriminated against by KRS 238.550(4) because their rent is subject to reasonable limitations, although there is no explicit limit on the purchase price when buying a building for charitable gaming purposes. They contend that this favors larger charities which are able to purchase buildings or use buildings already owned for charitable gaming. Reasonable rent restrictions on charitable gaming enterprises have been upheld in other states despite equal protection attacks such as this. *See Joseph Bros. Co., supra,* and *Edmisten, supra,* both holding that rent restrictions are nondiscriminatory and are rationally related to the state's interest in assuring that most charitable gaming receipts actually benefit charitable works. We likewise conclude that the rent restrictions are nondiscriminatory and are rationally related to the state's interest in assuring that most charitable gaming receipts actually benefit charitable works. Further, while the buying of a building is generally a one-time expense (although financing payments are generally made over a period of time), rent is an ongoing expense that may be raised periodically. Thus, there is a substantial distinction between buying

and renting which suggests the propriety of the statute. *Holmes, supra.*

■ The charitable organizations argue that KRS 238.550(5) is unconstitutionally overbroad. That statute provides that

[a]ll net receipts resulting from the conduct of charitable gaming shall be utilized exclusively for purposes consistent with the charitable, religious, educational, literary, civic, fraternal, or patriotic functions and objectives for which the licensed charitable organization received and maintained federal tax-exempt status. No net receipts shall inure to the private benefit or financial gain of any individual.[11]

Without reiterating the authorities cited by the charitable organizations herein, suffice it to say that their arguments are that this restriction violates their rights under the First and Fourteenth Amendments of the U.S. Constitution. However, charitable gaming enterprises do not constitute conduct protected by the First Amendment. *See There to Care, Inc. v. Commissioner of Indiana Dept. of Revenue,* 19 F.3d 1165 (7th Cir. 1994), and *Allendale Leasing, Inc. v. Stone,* 614 F.Supp. 1440 (D.C.R.I.1985). Since no constitutionally protected activity is infringed upon by regulating charitable gaming enterprises, such regulation is subject to "the lowest standard of scrutiny: the rational basis test" (rather than the heightened scrutiny involved in the regulation of First Amendment activity). *Allendale, supra,* at 1457. This provision of the statute passes the rational basis test because it is rationally related to the legitimate state interest in insuring that receipts from charitable games are actually furthering charitable activities, rather than providing windfalls to individuals.

In short, the challenged portions of KRS 238.550 are constitutional.

■ Finally, the charitable organizations challenge the constitutionality of KRS 238.995, which provides criminal penalties for violating portions of the Charitable Gaming Act. They argue that subsections (2), (4), and (5) of KRS 238.995 "are attempts to criminal-

---

**10.** KRS 238.550(4) in the pre–1996 version is now KRS 238.550(3) in the current version.

**11.** This statute and its content were amended and replaced in 1996 by KRS 238.550(4).

ize legitimate activities" and thus are unconstitutional. Subsection (2) provides that making false or misleading statements in license applications or required reports is a Class A misdemeanor. Subsection (4) provides that anyone who knowingly diverts charitable gaming funds to his or her financial benefit from legitimate charitable purposes or lawful expenses allowed under the Charitable Gaming Act has committed a Class A misdemeanor. Subsection (5) is an enhancement provision making a second violation of subsection (1) or subsection (2) a Class D felony. Making false statements and diverting charitable gaming funds are not legitimate activities but are inherently criminal acts. Thus, the state is within its police power to affix penalties for these acts.

We affirm the ruling of the Jefferson Circuit Court in part, reverse it in part, and determine that all portions of the Charitable Gaming Act (KRS 238.500 -.995) which the charitable organizations have standing to challenge are constitutional.

HUDDLESTON, J., concurs.

KNOPF, J., concurs with separate opinion.

KNOPF, Judge, concurring.

I concur with Judge Buckingham's well-reasoned and well-written opinion, but choose to write separately. Section 226 of the Kentucky Constitution forbade the establishment of lotteries until 1988. This prohibition included bingo, even if conducted for charitable purposes. *Otto v. Kosofsky*, Ky., 476 S.W.2d 626 (1971). The General Assembly had no authority to regulate bingo in any way other than to completely ban it. *Id.* at 630. Despite the prohibition, bingo continued to be popular both as a pastime and as a means for charitable fund-raising. Many law enforcement officers and prosecutors simply refused to enforce the prohibition. As a result, bingo and other charitable gaming remained unregulated.

In order to correct this situation, the General Assembly presented two (2) amendments to § 226 to the voters. The 1988 amendment to § 226 permitted the establishment of a state lottery and the 1992 amendment allowed the General Assembly to permit charitable lotteries and charitable gift enterprises. These amendments were both approved by the majority of Kentucky voters. In particular, paragraph (2) of § 226 allows the General Assembly to enact laws regulating charitable lotteries and gift enterprises. It is clear that, since the General Assembly has the authority to ban charitable gaming outright, or, under § 226 of the Kentucky Constitution, to regulate it, the charities have no valid argument that Chapter 238 is unconstitutional under the Kentucky Constitution. Furthermore, the 1996 amendment to KRS 238.540(4) clarifies the question of whether volunteer workers are prohibited from accepting tips.

However, the underlying issue of whether or not such a prohibition violates the First Amendment protection for free speech is a difficult question. The United States Supreme Court has held that solicitation of money by charities is protected speech for purposes of the First Amendment to the United States Constitution. *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). In *Schaumburg*, and its progeny, *Maryland v. Joseph H. Munson, Co.*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); and *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), the Supreme Court held that the First Amendment places severe limits on states' ability to regulate charitable fundraising. *Schaumburg* explains:

> Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solic-

itation the flow of such information would likely cease. Canvassers in such context are necessarily more than solicitors for money. Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.

*Id.* at 632, 100 S.Ct. at 832–33, 63 L.Ed.2d at 84–85.

Thus, any restriction on charities limiting payment of professional fundraisers must be narrowly tailored to accomplish legitimate state objectives, to ensure that the statute will not create an unnecessary risk of chilling free speech. *Munson,* 467 U.S. at 967–68, 104 S.Ct. at 2852–53, 81 L.Ed.2d at 802–03. In essence, the Supreme Court has set forth a "strict scrutiny" test in judging the constitutionality of limitations on charitable fundraising. *Riley,* 487 U.S. at 786–87, 108 S.Ct. at 2671–72, 101 L.Ed.2d at 684. The charities in this case assert that, since their charitable gaming is merely another form of fundraising, it is protected speech and cannot be restricted without meeting the strict scrutiny standard.

I believe that the charities' comparison between direct charitable solicitation and fundraising through charitable gaming is flawed. Solicitation is intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political or social issues. On the other hand, bingo or other charitable gaming does not implicate the same free speech interests. Wagering is an activity, not speech. The state's authority to regulate or proscribe gambling is unquestioned. Consequently, I fail to see how the use of gambling by charitable organizations to raise funds implicates free speech. I would also point out that the charities' argument, if taken to its logical conclusion, could completely exempt charitable organizations from compliance with many laws of general application. The First Amendment does not entitle a charity "to stage a bullfight in the Hoosier Dome, if in its view that contest

would raise money for its endeavors and be a good forum for the dissemination of its views." *There to Care, Inc. v. Commissioner of Indiana Department of Revenue,* 19 F.3d 1165, 1168 (7th Cir.1994). Such a result would not lead to greater dissemination of ideas, but to chaos. As pointed out so well by the Seventh Circuit in *There to Care,* "Charities do not have special privileges under the first amendment; by parallel reasoning then, political and educational organizations, the press, and speakers in general could engage in gambling and other proscribed activities to raise funds". *Id.*

Therefore, I agree with the majority that no First Amendment rights are implicated by the Charitable Gaming Act. The regulations set out in KRS Chapter 238 affect only the charities' conduct of their games, not the message which they seek to promulgate. The restrictions are reasonable and are rationally related to the legitimate State interests set forth in § 226 of the Kentucky Constitution and in KRS 238.500. As a result, I agree with the majority that they do not unconstitutionally impinge upon the charities' First Amendment rights.

In closing however, I would add that the ban on tipping volunteer workers may go beyond what is necessary to prevent fraud in all cases. Unlike direct payment of volunteer workers by the charity, tipping is initiated by the players themselves. The involvement of the charity, if any, is minimal. Thus, I question whether the ban against tipping actually furthers the goals set out in § 226 or in KRS 238.500. However, it is not our place to pass on the wisdom of the laws, only their application and constitutionality. Courts should exercise a liberal rather than a restrictive attitude toward legislative acts enacted pursuant to the police power inherent in the exercise of governmental functions. Legislative acts should not be set aside lightly, but only when it is plainly violative of some constitutional provision. *Whitaker v. Green River Coal Co.,* 276 Ky. 43, 122 S.W.2d 1012, 1016 (1938). Therefore, since no constitutional rights are affected by the Charitable Gaming Act, the issue of tipping volunteer workers must be addressed to

the General Assembly by those interested or affected.