**Ralph Rankin WILLIAMS, Appellant,**

v.

**COMMONWEALTH of Kentucky,
Appellee.**

Supreme Court of Kentucky.

Nov. 18, 1977.

Rehearing Denied Jan. 31, 1978.

Jack Emory Farley, Public Defender, Erwin W. Lewis, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

On January 3, 1977, Ralph Rankin Williams, a/k/a Jimmy Henry Windham, Jimmy Wayne Windham and Keith Bishop, was indicted by the grand jury of Jessamine Circuit Court. The indictment charged him with "murder by striking Sammy Guy with

a club or wooden board." KRS 507.020. Williams was found guilty and the jury fixed his punishment at life in the penitentiary. Subsequently, he moved for judgment notwithstanding the verdict and for a new trial. Both motions were overruled. Final judgment was entered on February 4, 1977. It is from that judgment that Williams prosecutes this appeal.

The facts leading to the arrest and conviction of Williams are summarized as follows:

On October 11, 1976, Sammy Guy's partially decomposed body was found near Wilmore, Kentucky by Guy's sister, Freda Marlow. The evidence reveals that Guy was probably killed by a blow to the head by a broad, flat object. Other possible causes could not be ruled out because of the decomposition of the upper half of Guy's body. At the scene, the officers found a freshly broken 2″ by 2″ board on which bloodstains were found. They also recovered a broken-bladed knife, later identified as belonging to Williams. Other items found near the scene of the crime were: an installment contract in Guy's name, a sleeping bag and tent loaned to Williams, and a pair of his jeans with blood on them.

In the latter part of April 1976, Virginia Philpot, a 17-year-old resident of Wilmore, Kentucky, went to Omaha, Nebraska to visit her sister. While in Omaha, Virginia worked at the headquarters of the Salvation Army. There she fell madly in love with Jimmy Windham. While in Omaha, they dated and on one occasion at a hotel Jimmy choked her. The ties of love were so strong, however, that they made a tryst that Virginia would return to Kentucky and that Jimmy would follow. However, Jimmy arrived first. Virginia arrived on September 6, 1976. Jimmy called her from Cincinnati. She picked Windham up in Lexington, Kentucky. He visited Virginia's home the week of September 10, while her father was away. On that visit Jimmy used the name of Keith Bishop. "He told me he was going to (use the name Bishop) because he didn't want my parents to know what his real name was. Because he had

beat me up in Omaha and he thought my sister would tell." On Sunday, September 12, 1976, Virginia's mother "found out that wasn't his real name and she asked him to leave." Again on the weekend of September 24th, Jimmy visited the home of her parents. After that, Jimmy started "staying by the railroad tracks in a tent furnished by Virginia's friend, Joyce Woods, also 17 years of age. Virginia furnished Jimmy with food, water, a sleeping bag, and sometimes a little money. She saw him practically every day. Jimmy told Virginia how much he loved her. They planned to leave together and get married.

Virginia's father was not impressed with her lover. He testified that Jimmy "began telling me the things he had been doing over the years and I put two and two together and I recognized that he had her snowed." Virginia's father told Windham not to call or see Virginia any more.

On Friday, October 1, 1976, Virginia's father permitted her to leave, presumably to go to Lexington. However, she went from her father's home to see Jimmy. As she was driving up the road, she saw Jimmy walking down the old railroad tracks toward her car. Jimmy was limping. Virginia testified that Jimmy got in her automobile on the passenger side and said, " 'Let's go back out of here' and I told him no and asked him why he was limping. He had scratches on his face . . . and he said that he had gotten into a fight and I asked him who with and he said Samuel Guy and that he had killed him." Virginia testified that she had seen Guy the night before down the road with some other persons. On another occasion when she was visiting Jimmy, Sammy was asleep on an old couch by the side of the road.

Virginia testified that Jimmy said, "If I ever told anybody he wouldn't hurt me but he would my parents or one of my sisters or my niece. He said that he would kill them if I ever told."

Virginia's father testified that Virginia left their home on October 1, 1976, at 6:30 P.M. and "She come back in about 11:30 or something like that . . . she come in

and woke me up and told me that she wanted to talk and we went in and sat down on the couch and talked. She told me then that Jimmy was still there and she had seen him and he had been in a fight with somebody. That was on Friday, October 1." (The Jimmy Windham referred to in the evidence was in fact Ralph Rankin Williams).

Frank Sims testified that he met Jimmy (Williams) in July or August 1976. He also testified, "He wanted to know where he could find a motorcycle or steal one so he could get out of town . . . and he asked me where he could possibly rob somebody for $400.00 or $500.00." Sims further testified that he (Williams) had been in a dispute with Guy. That discussion was either the same day or the day after Sims learned of the murder of Sammy Guy.

Dr. McClellan, a pathologist, testified that Guy's body was partially skeletonized and the head was deteriorated and had a 12 cm. fracture in the right side above the eye socket. The bones were lying inside the head, and no brains remained. The upper half of Guy's body was a complete skeleton. There were no organs in the rib cage. The pathologist was of the opinion that the instrument that caused the fracture was fairly heavy and broad and compatible with the pieces of board which were found at the scene of the crime.

Johnny Hogee and his son saw Guy and talked with him on a Friday night near where his body was found. Hogee and his small son had their dog with them. He testified that, "We sat and talked . . . a long time and this car come back through there . . . and I said, Sam, who is that . . . . He told me it was Virginia Philpot's car and she was bringing this boy back there. We wasn't back there maybe for five or ten minutes and she come back out by herself." Subsequently, Virginia Philpot corroborated Hogee's testimony. She testified that on the night of September 30, 1976, she drove her car down the railroad right-of-way and saw Sammy Guy and his van. Jimmy was with her and she saw "another guy and a dog and a little boy down there," and, "I just took Jimmy down the road and I turned around and came home."

A laboratory technician for the Kentucky State Police testified that he found blood on Williams' blue jeans in at least 15 different locations. He testified, "On the inside in a pocket here you can still see that blood and there is another bloodstain up in here. Further on down there is some blood . . . a fairly large concentration right on the knee . . . and then there was a little bit of blood . . . below the knee . . near the cuff. On the other leg, the blood started about . . . this area of the thigh . . . and again on the knee there is a large amount of blood. On the back of the blue jeans in this pocket there is a streak running here and a large concentration on the back." The technician also testified that he found human blood on some sections of the board and also on the tennis shoe.

After Virginia Philpot had notified the authorities, a warrant was issued for Windham a/k/a Williams on October 11, 1976. On October 12, State Detective Jerry Lovett arrested Williams in Lexington, Ky. After Williams' arrest the detective explained his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Commonwealth's Attorney asked Detective Lovett the following questions to which he responded:

"Q 34 Did you make any investigation as to the, who in fact is the Henry Early Windham was?

A Yes sir, I did.

Q 35 Where did he reside?

A There was such a person who resided in Watchulla, Florida prior to being murdered this year, this last year.

MR JACKSON: Object.

COURT: Sustained, you won't consider that, ladies and gentlemen. Dismiss that from your mind.

Q 36 The social security card had the name of Henry Early Windham?

A Yes sir, it did.

Q 37  Where was this found?
A  This was in the wallet of the defendant, Williams.
Q 38  And the driver's license had what name on it?
A  Jimmy H. Windham."

Williams contends that the evidence of the murder of Henry Early Windham was inadmissible against him. He argues that the above-quoted testimony was adduced by the Commonwealth's Attorney so as to get before the jury the inference that Williams was the murderer of Henry Windham.

Throughout the trial the witnesses identified Williams as "Jimmy Windham." These witnesses included the sheriff, Frank Sims, Johnny Hogee, Detective Lovett, Virginia Philpot, her father Daniel Philpot, and Joyce Woods. The sheriff originally issued an all-points bulletin for Jimmy Windham and the arrest warrant was issued for Jimmy Windham.

█  The Omaha driver's license was issued in the name of Jimmy H. Windham. The social security card was in the name of Henry Early Windham. Whether "Jimmy was a nickname of Henry Windham needed to be established. It was necessary to establish whether Ralph Williams was Jimmy Windham or Henry Windham." In that posture, this court is of the opinion that the testimony was admissible, because it was evidence of a collateral fact by which Williams' identity was established. See *LeGrande v. Commonwealth*, Ky., 494 S.W.2d 726 (1973).

Williams complains that a verbal statement he made to Detective Lovett was not admissible because it was hearsay and contained evidence of other crimes. The evidence clearly shows that the oral statement about which Williams complains was made after his *Miranda* warnings were read to him. The statement about which Williams complains was in response to a question by the Commonwealth's Attorney to Detective Lovett, who had reduced the statement to writing. The statement is obscene, profane, and was made by Williams in an effort to place the blame for Guy's murder on Virginia Philpot and Joyce Woods. The statement is as follows:

"A  Do you want to know what the f__k happened? I will tell you g__ d__n it. the g__ d__n Virginia Philpot and Joyce Woods are a couple of g__ d__n whores. They came down there to f__k Sammy Guy. They thought that he had a $1,000. He was broke and couldn't f__k and they beat the s__t out of him. They killed him. Jennie came back to me after they killed him and asked me to go up the road and bury him. Jennie wiped blood all over my shirt and pants and I will take you and show you where they are. I shoved them into a briar patch beside my campsite. I was hot and had to get the hell out of there. *I might as well tell you that my real name is Ralph Williams and I am an escapee from the prison in Alabama.*" (Emphasis added).

█  This court is of the opinion that the statement is admissible. It established Williams' true identity and his motive for using an alias. The statement by Williams is an effort on his part to place the blame on Virginia Philpot and Joyce Woods. This in effect was an attempt on the part of Williams to conceal the facts, which is admissible as showing a guilty conscience. Also, the statement shows that Williams professed to know what happened. The statement is not hearsay evidence; it is not admitted for the purpose of proving the truth of what was said, but for describing the relative details of what Williams said took place.

Williams did not testify in his behalf. Therefore, it is uncontroverted that the statement was made voluntarily after Williams was given his *Miranda* warnings. This court has held that a confession made voluntarily after a defendant has been advised of his rights under *Miranda*, supra, is admissible. *Dolan v. Commonwealth*, Ky., 468 S.W.2d 277 (1971).

Williams' contention that the photographs were inadmissible is without merit. This court's opinion in *Brown v. Commonwealth*, Ky., 558 S.W.2d 599 (decided on this date) is dispositive of the issue.

Finally Williams argues that the closing argument of the Commonwealth's Attorney was replete with improper references to matters outside the record. He also insists that the prosecutor attacked his character. This court has read the closing argument, and is of the opinion that Williams' assertions are refuted by the record. Furthermore, counsel for Williams made no objection to any part of the argument and raises the issue for the first time here. Hence, there was no error. The trial court had no opportunity to make a ruling.

Despite Williams' contention that his conviction was procured during a trial that could not possibly be deemed tolerably fair, this court is not so persuaded.

Accordingly, the judgment is affirmed.

All concur.