# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: AUGUST 24, 2017
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000347-WC

AUSTIN POWDER COMPANY      APPELLANT

V.

ON APPEAL FROM COURT OF APPEALS
CASE NOS. 2014-CA-000918-WC & 2014-CA-000946-WC
WORKERS' COMPENSATION BOARD
NO. 12-WC-01514

BILLY KEITH STACY;      APPELLEES
HON. R. SCOTT BORDERS,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

An Administrative Law Judge (ALJ) found that Billy Keith Stacy suffered from an occupational noise-induced hearing loss and from work-related repetitive trauma to his wrists and low back. Based on those findings, the ALJ found that Stacy is permanently totally disabled, and he awarded income and medical expense benefits accordingly. Austin Powder Company appealed to the Workers' Compensation Board (the Board), which affirmed in part, and reversed and vacated in part. Both parties sought review before the Court of

Appeals, which affirmed the Board in part and reversed in part.[1] Austin Powder appeals to this Court arguing that the portion of the ALJ's opinion affirmed by the Board and the Court of Appeals was not supported by evidence of substance and should be reversed in its entirety. Having reviewed the record, the lengthy and well-reasoned opinions from below, and the arguments of the parties, we affirm.

## I. BACKGROUND.

Stacy testified that he worked as a drill operator for Austin Powder from May 3, 2005 until he was laid off on April 16, 2012. Following his last day of work, Stacy filed workers' compensation claims for: cumulative-trauma injuries to his wrists, hands, and low back; occupational hearing loss; and coal workers' pneumoconiosis. The only claims in dispute on this appeal involve Stacy's alleged work-related injuries to his wrists and hands and his hearing loss; therefore, we do not address any of the evidence filed in his coal workers' pneumoconiosis claim.

Stacy operated a piece of heavy equipment called a drill. As a drill operator, Stacy was required to measure and lay out grids along an area to be surface mined and to mark where he would drill holes for blasting. This required him to climb in and out of the drill's cab. Once an area was marked,

---

[1] The Board rendered its opinion before this Court rendered *Hale v. CDR Operations, Inc.*, 474 S.W.3d 129 (Ky. 2015). Thus, the Board stated that the ALJ, on remand, had to determine what portion, if any, of Stacy's cumulative trauma injury occurred while Stacy was employed by Austin Powder and the onset date of Stacy's injuries. The Board then instructed the ALJ to apportion any entitlement to benefits accordingly. The Court of Appeals, based on *Hale*, reversed the Board's findings on those two issues.

2

Stacy sat in what he described as a non-pressurized, heated/air-conditioned cab and operated the drill by manipulating a number of switches and levers. Stacy also had to clean the tracks and grease the drill. He described his job as not requiring a great deal of physical exertion and testified that he wore hearing protection while working.

Stacy testified that he could sit for long periods without difficulty but experienced back pain when standing for more than fifteen minutes and when walking. Using his hands caused swelling and pain in his hands and wrists. Stacy stated that he was not receiving any specific medical treatment for his physical conditions. As to his hearing loss, Stacy did not realize he had a problem until after he had his hearing checked, although he did report that his children sometimes told him to turn down the volume on the television.

Hirley Smith, blasting coordinator for Austin Powder when Stacy worked there, testified that the cab was pressurized to reduce exposure to noise and dust. According to Smith, the noise level in the pressurized cab had been measured at 74.2 to 76 decibels and the hearing protection Stacy wore reduced the noise level by 32 decibels.

In support of his injury claim, Stacy filed reports from Dr. Hughes; the August 22, 2012 note from Baptist Southeast Orthopeadics/Dr. Belhasen; the physical capacities evaluation of Dr. Raichel; and the April 29, 2013 NCV report from M&G Neurophysiology. Austin Powder filed several reports and the deposition of Dr. Schiller, the deposition of Dr. Hughes, the July 25, 2012 note from Baptist Southeast Orthopeadics/Dr. Belhasen, and the report of Dr.

Gabriel. In support of his hearing loss claim, Stacy filed the September 6, 2012 report from audiologist Robert Moore. Pursuant to KRS 342.315(2) and 803 KAR 25:010(11), the Department of Workers' Claims filed the February 19, 2013 Form 108-HL, Medical Report – Hearing Loss of Drs. Jones and Ormond. Austin Powder filed the deposition of Dr. Jones. We summarize that medical evidence below.

The parties, the ALJ, the Board, and the Court of Appeals discuss Dr. Hughes's reports in detail. For reasons that are unclear, those reports are not in the record before us; however, neither party has indicated that the reports were not filed with the Department of Workers' Claims or were not properly in evidence, or were not in the record before the Board and the Court of Appeals.[2] Although Austin Powder objects to the ALJ's reliance on Dr. Hughes's reports, it does not dispute the accuracy of the ALJ's summary of those reports or the Board's quotes from those reports.[3] Therefore, we adopt the following summary of Dr. Hughes's reports by the ALJ and the following quotes from Dr. Hughes's reports by the Board as our own.

> The Plaintiff submitted the Form 107 from Dr. Hughes dated November 28, 2012. Mr. Stacy related to Dr. Hughes an employment history of being employed as a drill operator where

---

[2] The Court of Appeals issued an order to the Department of Workers' Claims requesting that it supplement the record by producing documents associated with Stacy's injury claim. The Department did provide a supplement; however, the supplement that this Court has contains records related to Stacy's coal workers' pneumoconiosis claim, not his injury claim.

[3] We note the ALJ stated in his opinion and award that Dr. Hughes assigned an 18% permanent impairment rating when Dr. Hughes had actually assigned a 16% permanent impairment rating. The ALJ corrected that finding in his order on reconsideration.

4

[he] had a gradual onset of lower back pain with standing and walking beginning approximately five years ago. He feels okay when lying or sitting and the pain occur[s] when he is changing drill bits and walking or bending over. He does not have leg pain and no tingling of the legs. He has been running equipment and performing surface mining for 41 years. He can run the drill while sitting but is unable to run rock trucks, graders, loaders, and dozers.

He has a past history of hypertension and gout affecting particularly the right foot and was unable to work when the gout is active. He has had pain in both hands for the past seven years. His hands swell and he is unable to grasp a handrail or even use toggle switches on the drill when his hands are swollen. The pain flares up when he tries to use his hands. He has also experienced an 80% hearing loss.

Dr. Hughes reviewed the medical report of Dale Williams, DC; evaluation by Michael Raichel, DO; an audiogram dated September 6, 2012; diagnostic studies, and performed a physical examination on him.

Based on the foregoing, Dr. Hughes diagnosed the Plaintiff with lower back pain and bilateral hand and wrist pain and reduced range of motion and strength.

Dr. Hughes opined that the Plaintiff's long history of repetitive injuries as a consequence of his occupation as a heavy equipment operator for the past 41 years is the cause of his complaints. Dr. Hughes notes that Mr. Stacy's lower back pain has interfered with his ability to operate heavy equipment because he cannot stand, walk, or lift. He is able to sit. This has interfered with his ability to perform ordinary tasks of daily living at home as well[.] He has developed bilateral hand pain attributed to arthritis, which also limits his ability to use his hands for ordinary tasks at home or in his job as a driller and heavy equipment operator.

Using the Fifth Edition of the AMA Guides, Dr. Hughes assessed the Plaintiff an 18% functional impairment rating. MMI has not been reached, as he has had no significant treatment for the lower back or bilateral hand condition. Dr. Hughes does not feel the Plaintiff retains the physical capacity to return to the type of work he was performing at the time of his injury. He should avoid any prolonged standing or walking; lifting he would suggest 10 pounds regularly and 20 pound[s] on occasion. He cannot get on and off

5

the equipment safely because of hand problems and should avoid bending and twisting the lumbar spine.

Attached to the Form 107 was an additional report dated December 19, 2012, in which Dr. Hughes opined the Plaintiff would be at MMI and that the impairment rating remained the same, and the restrictions would remain the same. He is of the opinion that the Plaintiff is incapable of returning to his former occupation.

The Board quoted from Dr. Hughes's reports as follows:

With respect to causation, [Dr. Hughes] stated as follows:

> Within reasonable medical probability, the plaintiff's long history of repetitive injuries as a consequence of his occupation as a heavy equipment operator for the past 41 years is the cause of his complaints.

> Mr. Stacy has lower back pain, which is a consequence of his occupation, and he has bilateral hand pain, which, as he understands it, had been attributed to arthritis, which also is a consequence of long term repetitive trauma as a consequence of his occupation.

Under the heading "Explanation of Causal Relationship," Dr. Hughes provided the following:

> Mr. Stacy's lower back pain has interfered with his ability to operate heavy equipment because he cannot stand, walk or lift. He is able to sit. This has interfered with his ability to do the ordinary tasks of daily living at home as well. He has developed bilateral hand pain attributed to arthritis, which also limits his ability to use his hands for ordinary tasks at home or in his job as a driller and heavy equipment operator.

Dr. Hughes assessed a 16% impairment rating broken down as follows:

Lower back pain 5%

Reduced range of motion of the left wrist 5%

Restricted range of motion of the left wrist 1%

6

Reduced grip strength $[sic]6%[.]

In his deposition, Dr. Hughes admitted that he did not know how often Stacy performed various tasks or how much force he used in doing so. Furthermore, Dr. Hughes could not cite to any specific studies to support his finding that Stacy had suffered cumulative-trauma injuries. However, he stated that he believed such studies exist. As to his impairment ratings, Dr. Hughes admitted that the <u>AMA Guides to the Evaluation of Permanent Impairment</u>[4] (the <u>Guides</u>) states that loss of grip strength should not be used when a person has hand/wrist pain. He also admitted that he only did active range of motion testing when the <u>Guides</u> requires both active and passive testing if there is a deficit. Finally, Dr. Hughes stated that he had no explanation for Stacy's wrist/hand complaints other than trauma from repetitive motion.

The Baptist Southeast Orthopeadics/Dr. Belhasen notes indicate that Stacy complained of bilateral wrist, ankle, and foot pain, and he has a history of gout. According to Dr. Belhasen, Stacy had apparently learned to control his gout with diet and medication when he had an acute episode. However, Stacy noted that his wrist pain had gotten progressively worse and that work activity "at times [made] his hand pain quite severe." Dr. Belhasen made diagnoses of gout in the wrists, ankles, and feet in his July 2012 note and "Localized Primary Arthritis of the Wrist" in his August 2012 note. He stated that Stacy's

---

[4] Linda Cocchiarella and Gunnar B.J. Andersson, AMA Guides to the Evaluation of Permanent Impairment (5th ed. 2012).

7

work as a heavy equipment operator "increased [his] hand and wrist pain," and noted that Stacy could undergo surgery but that the surgery would likely fail if Stacy continued working.

Dr. Raichel listed diagnoses of: hypertension, gout, hyperglycemia, B12 deficiency, testosterone deficiency, and anxiety. His evaluation indicated that Stacy can only work two hours per day, can only sit and stand for one hour per day, and should avoid repetitive hand movements and crawling, squatting, etc. The M&G Neurophysiology record indicated that Stacy underwent an NCV on April 29, 2013 which showed evidence of bilateral carpal tunnel syndrome.

Dr. Schiller first evaluated Stacy on February 28, 2013. Stacy advised Dr. Schiller that he suffered from low back and wrist pain with wrist and hand swelling when working. However, Dr. Schiller noted that Stacy had no active complaints of pain or swelling on that day. Dr. Schiller's examination revealed no neurological or range of motion deficits in Stacy's wrists, hands, or lumbar spine. He made a diagnosis of age-related degenerative changes of the lumbar spine and noted that Stacy might have arthritis in his wrists; however, he did not have enough information to render a conclusive hand/wrist diagnosis. Based on his findings, Dr. Schiller assigned Stacy a 0% permanent impairment rating for Stacy's back but stated that, because he did not have sufficient information, he could not assign an impairment rating for Stacy's wrists. Dr. Schiller stated that Dr. Hughes's impairment ratings were not supported by the Guides, and that it appeared Dr. Hughes did not know how to use the Guides. Finally, Dr. Schiller stated that, based on his research, repetitive trauma

8

cannot cause degenerative changes, which are likely related to genetics; therefore, absent a specific traumatic event, Stacy could not have suffered a work-related injury.

Dr. Schiller re-evaluated Stacy on May 8, 2013 and reviewed Dr. Belhasen's medical records. According to Dr. Schiller, Dr. Belhasen found evidence of "fluid collections over the dorsal aspect of both wrists and a dorsal portion of [Stacy's] hand" and made a diagnosis of gout involving both wrists and ankles. Dr. Schiller's examination on May 8 revealed decreased wrist range of motion bilaterally, but no crepitus, complaints of pain, or evidence of carpal tunnel syndrome, and the ability to make fists with both hands. Based on his records review and examinations, Dr. Schiller concluded that Stacy suffers from "psychosomatic complaints related more to the secondary gain of a lawsuit than anything else."

Dr. Gabriel examined Stacy at the request of Austin Powder on May 14, 2013 and found decreased wrist range of motion bilaterally and positive Tinel's sign bilaterally, but negative Phalen's and median nerve tests. X-rays of Stacy's wrists showed mild degenerative changes with inflammatory arthropathy and Dr. Gabriel made diagnoses of chronic bilateral hand/wrist pain, gouty/degenerative arthritis bilaterally; and bilateral carpal tunnel syndrome. According to Dr. Gabriel, Stacy's complaints are "more likely than not" related to genetic factors and other "comorbid medical risk factors" rather that cumulative trauma, which "has not been confirmed as a reason to develop

9

degenerative arthritis." Finally, Dr. Gabriel stated that Stacy had not reached maximum medical improvement and could use his hands "as tolerated."

In his report, audiologist Moore stated that Stacy has moderate to severe high frequency hearing loss; however, he did not address whether Stacy has a hearing-related permanent impairment rating. In their report, Drs. Jones and Ormond stated that Stacy's pattern of hearing loss is compatible with hazardous workplace noise exposure. They assigned Stacy a 2% permanent impairment rating, which they attributed to that exposure.

In his deposition, Dr. Jones testified that, pursuant to OSHA guidelines, exposure to noise of less than 85 decibels over an eight-hour day is not deemed to be an injurious exposure. Furthermore, he stated that exposure to noise at 73 decibels or less, with or without hearing protection, would not be expected to produce hearing loss. Dr. Jones stated that, once a person has hearing loss, his condition will not improve, but it could worsen with additional exposure. Finally, Dr. Jones confirmed his conclusion that Stacy suffered an occupational noise-related hearing loss; however, he could not state whether Stacy's last injurious exposure occurred at Austin Powder.

Based on the preceding evidence, the ALJ found that Stacy suffered an occupational hearing loss and that Stacy was last exposed to "occupational noise while employed" by Austin Powder. In so finding, the ALJ noted that Dr. Jones's opinion is granted presumptive weight pursuant to KRS 342.315 and Austin Powder had not overcome that presumption. However, because Stacy's

10

hearing loss permanent impairment rating was less than 8%, the ALJ awarded medical expense benefits only.

The ALJ also found that Stacy suffered cumulative trauma injuries to his lumbar spine and wrists. In doing so, the ALJ specifically found Stacy's testimony to be credible and the opinion of Dr. Hughes to be the most persuasive. The ALJ then found that Stacy has a 16% permanent impairment rating as assigned by Dr. Hughes and that, based on his age, education, work experience, and limitations, Stacy is permanently totally disabled.

Austin Powder appealed to the Board, which affirmed in part, vacated in part, and remanded. The Board found that Dr. Hughes's Form 107 and deposition testimony supported his objective medical findings. However, the Board found that Dr. Hughes's assignment of a permanent impairment rating based on Stacy's loss of grip strength and lumbar spine condition were not supported by and are contrary to the Guides. However, the Board found that Dr. Hughes's determination of permanent impairment rating for loss of wrist range of motion was appropriate under the Guides. As to Stacy's hearing loss, the Board found that Stacy's report to Dr. Jones that the drill was "a pretty noisy piece of equipment" was sufficient to support Dr. Jones's opinion regarding causation. Thus, the Board affirmed the ALJ's finding that Stacy has a 6% permanent impairment rating related to his wrists but vacated the ALJ's findings as to Stacy's other injury-related permanent impairment ratings. The Board also vacated the ALJ's finding of permanent total disability and remanded for the ALJ to make a new determination regarding the onset date of

11

and the extent and duration of Stacy's disability. Finally, the Board noted that the absence of a permanent impairment rating for Stacy's alleged back injury was not determinative of the existence of said injury. Therefore, the Board instructed the ALJ on remand to determine if Stacy had suffered a repetitive trauma back injury and if Stacy is entitled to medical expense benefits for treatment of any such injury.

Stacy and Austin Powder sought review by the Court of Appeals. The Court of Appeals affirmed the Board's opinion vacating the ALJ's findings regarding Stacy's lumbar spine and grip strength permanent impairment ratings. The Court of Appeals also affirmed the Board's remand for findings regarding entitlement to medical expense benefits for Stacy's alleged lumbar spine injury. In doing so, the Court noted that neither party had raised any issues with those findings by the Board. The Court also affirmed the Board's finding that the ALJ did not abuse his discretion by relying on Dr. Hughes's 6% wrist-related permanent impairment rating and Dr. Jones's 2% hearing-related permanent impairment rating.

## II. STANDARD OF REVIEW.

The ALJ as fact finder has the sole authority to judge the weight, credibility, substance, and inferences to be drawn from the evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985). In reaching his decision, the ALJ is free to choose to believe or disbelieve parts of the evidence from the total proof, no matter which party offered it. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977). If the party with the

12

burden of proof is successful before the ALJ, the question on appeal is whether the ALJ's opinion was supported by substantial evidence. *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999). Substantial evidence is evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people. *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971). However, the ALJ's discretion is not limitless and we will reverse the ALJ if his opinion "is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law." *Ira A. Watson Dep't. Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000). Furthermore, when there are mixed questions of fact and law, we have greater latitude in determining if the underlying decision is supported by the evidence. *Purchase Transp. Servs. v. Estate of Wilson*, 39 S.W.3d 816, 817-18 (Ky. 2001); *Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 117 (Ky. 1991).

## III. ANALYSIS.

Austin Powder argues that the ALJ's findings that Stacy has a 6% permanent impairment rating related to his hands and wrists and a 2% permanent impairment rating related to hearing loss are not supported by substantial evidence. We address each argument separately below.

### A. Hand/wrist permanent impairment rating.

Austin Powder argues that the ALJ could not rely on Dr. Hughes's opinion for two reasons: (1) Dr. Hughes did not calculate his permanent impairment rating in accordance with the Guides; and (2) Dr. Hughes's opinion was insubstantial because he: (a) had a faulty history; (b) knew nothing of

13

Stacy's work duties; (c) could not identify the source of Stacy's pain; and (d) relied on Stacy's "hearsay" statement that he had arthritis in his wrists. We address each argument in turn below.

## 1.    Calculation of permanent impairment rating.

Dr. Hughes admitted the Guides provides that, if active range of motion testing shows a deficit, an evaluator should test motion passively. Because he believed he might cause Stacy pain if he performed passive range of motion testing, Dr. Hughes only measured Stacy's active range of motion. Austin Powder argues that, because Dr. Hughes did not perform passive range of motion testing, his permanent impairment rating lacks any credibility. We disagree with Austin Powder's argument for two reasons.

First, we note that Austin Powder appropriately does not contest Dr. Hughes's finding that Stacy had decreased range of motion, a finding that both of its experts, Drs. Gabriel and Schiller, also made. Thus, the issue is not whether Stacy had a loss of range of motion but whether Dr. Hughes appropriately arrived at his permanent impairment rating based on his findings. As noted in Section 16.4 page 451 of the Guides, "*Measurements of active motion take precedence in the Guides . . . .* [and] [s]ound clinical knowledge and measurement techniques are necessary for appropriate impairment evaluation and rating." (Emphasis in original.) Since the Guides states that active motion testing takes precedence, we cannot say that Dr. Hughes's clinical judgment to forego passive range of motion testing was beyond acceptable practice under the Guides.

14

Second, Austin Powder's reliance on *Jones v. Brasch-Barry General Contractors*, 189 S.W.3d 149 (Ky. App. 2006) is misplaced. In *Jones*, the parties introduced evidence from three physicians. *Id.* at 151. Two of the physicians assessed Jones a 10% permanent impairment rating and one assessed him a 26% permanent impairment rating. *Id.* The physician who assessed the 26% permanent impairment rating admitted that Jones "did not meet the textbook definition" necessary to support that rating. *Id.* The physician explained his permanent impairment rating by stating "that the category definitions in the AMA Guides are meant to be used solely as the name of the text implies, as a guide." *Id.* at 152. Based on that physician's opinion, the ALJ found that Jones had a 26% permanent impairment rating. *Id.* The Board reversed the ALJ, holding that the finding of a "twenty-six percent (26%) permanent impairment was not, as a matter of statutory law, supported by substantial evidence." *Id.*

The Court of Appeals affirmed, holding that:

[A]n ALJ cannot choose to give credence to an opinion of a physician assigning an impairment rating that is not based upon the AMA Guides. In other words, a physician's latitude in the field of workers' compensation litigation extends only to the assessment of a disability rating percentage within that called for under the appropriate section of the AMA Guides. The fact-finder may not give credence to an impairment rating double that called for in the AMA Guides based upon the physician's disagreement with the disability percentages called for in the AMA Guides[.]

*Id.* at 153.

In *Jones* the physician assessed a permanent impairment rating that was not supported by his findings and that was in excess of the rating provided for

15

in the Guides. There is no evidence that the permanent impairment rating assigned by Dr. Hughes was not supported by his findings or that it was in excess of the rating provided for in the Guides. The dispute is with the method Dr. Hughes used to measure Stacy's range of motion, which is a different matter entirely from that considered by the Court of Appeals in *Jones*.

As noted above, Dr. Hughes admitted that the Guides requires both active and passive range of motion testing; however, as set forth in the Guides active range of motion takes precedence. The ALJ might have discredited Dr. Hughes's opinion because he did not perform both active and passive range of motion testing. However, because active range of motion testing takes precedence, Dr. Hughes's permanent impairment rating, which was based on active range of motion testing, was consistent with the Guides. Therefore, we agree with the Court of Appeals that Dr. Hughes's opinion regarding Stacy's wrist permanent impairment rating was based on the Guides.

## 2.    Substantial evidence.

As set forth above, Austin Powder argues that Dr. Hughes's opinion was also insubstantial because Dr. Hughes: (a) had a faulty history; (b) knew nothing of Stacy's work duties; (c) could not identify the source of Stacy's pain; (d) relied on Stacy's "hearsay" statement that he had arthritis in his wrists; and (e) made no finding that Stacy suffered a harmful change. We address each in turn.

16

**a.     Faulty History.**

Austin Powder argues that Dr. Hughes did not have a complete understanding of Stacy's history of gout in his wrists as contained in Dr. Belhasen's records. Dr. Hughes admitted that he was not an expert regarding gout, and, as the Board noted, Dr. Hughes did not make any reference to Dr. Belhasen's reports. The problem with this argument is that Dr. Belhasen's diagnoses–gout in the wrists in July 2012 and localized osteoarthritis of the wrists in August 2012–are arguably inconsistent. The ALJ could have found that Dr. Hughes's failure to cite to Dr. Belhasen's records made Dr. Hughes's opinion less credible; however, that failure did not render Dr. Hughes's opinion so insubstantial as to be unreliable as a matter of law.

**b.     Failure to understand the physical demands of Stacy's work.**

Austin Powder argues that Dr. Hughes's opinion is insubstantially unreliable because Dr. Hughes could not state that Stacy repetitively used his hands and arms at work. Furthermore, he could not state with specificity what actual movements Stacy made or how often he made those movements. According to Austin Powder, without that information, Dr. Hughes's opinion that Stacy suffered repetitive trauma to his wrists can be given no credence. However, as stated above, while the ALJ might have found that this lack of specificity from Dr. Hughes made his opinion less credible, it did not render it so insubstantial as to be unreliable as a matter of law. In reaching this conclusion, we note that Austin Powder has not cited us to any authority stating that a physician who lacks such specific information regarding the

17

nature of an employee's work is foreclosed from expressing an opinion regarding causation. Nor has it cited us to any authority that an ALJ is foreclosed from relying on such an opinion.

### c. Source of Stacy's pain.

Austin Powder argues that Dr. Hughes did not state specifically what the source of Stacy's pain is, thereby rendering his opinion unsubstantial. However, we note that Dr. Hughes stated that Stacy "has developed bilateral hand pain attributed to arthritis." Thus, Dr. Hughes did render an opinion as to a causative factor for Stacy's pain.

### d. Hearsay evidence of arthritis.

Austin Powder argues that the only evidence Dr. Hughes had that Stacy has arthritis came from Stacy's self-report. While that may be true, there is medical evidence that Stacy has arthritis in his wrists as reported by Dr. Belhasen (localized primary osteoarthritis of the wrist) and Dr. Gabriel (mild degenerative changes with inflammatory arthropathy of the wrist). Thus, Dr. Hughes's statement that Stacy has arthritis is supported by medical evidence and not solely dependent for its credibility on Stacy's self-report.

### e. Failure to find a harmful change evidenced by objective medical findings.

KRS 342.0011(1) defines injury as "any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause producing a harmful change in the human organism evidenced by objective medical findings." According to Austin Powder, Dr. Hughes made a diagnosis of pain, which is a

18

symptom and not a harmful change in the human organism evidenced by objective medical findings. We agree with Austin Powder that "[a] patient's complaints of symptoms clearly are not objective medical findings as the term is defined by KRS 342.0011(33)," *Gibbs v. Premier Scale Co./Indiana Scale Co.*, 50 S.W.3d 754, 762 (Ky. 2001), as modified on denial of reh'g (Aug. 23, 2001). However, we note that "the existence of a harmful change" can "be established, indirectly, through information gained by direct observation and/or testing applying objective or standardized methods that demonstrated the existence of symptoms of such a change." *Id.*

Here, Dr. Hughes found evidence of loss of range of motion through the use of a standardized method of testing and that finding demonstrated the existence of pain, a symptom of the change. Furthermore, there is evidence from Dr. Belhasen and Dr. Gabriel that Stacy has arthritis in his wrists, which is clearly a harmful change evidenced by objective medical findings.

Finally, we note that Austin Powder stated that "Drs. Raichel, Belhasen, Gabriel, and Schiller . . . all diagnosed gouty arthritis, not cumulative trauma." While it is true that none of those physicians made a diagnosis of cumulative trauma, Austin Powder's statement is not exactly a correct representation of those physicians' diagnoses. Dr. Raichel made diagnoses of hypertension, gout, hyperglycemia, B12 deficiency, testosterone deficiency, and anxiety. However, we note that Dr. Raichel did not state whether Stacy's gout was in his feet or wrists or both. Dr. Belhasen made two diagnoses – gout in the hands, wrists, and feet in July 2012 and localized primary arthritis of the wrist in

19

August 2012. He also noted that Stacy's work activity caused his complaints of pain to increase. Dr. Gabriel made diagnoses of chronic bilateral hand/wrist pain, gouty/degenerative arthritis bilaterally, and bilateral carpal tunnel syndrome. Dr. Schiller stated that Stacy might have degenerative arthritis in his wrists; however, he had insufficient information to categorically reach that diagnosis. Even if Austin Powder were correct and all four physicians had made a diagnosis of gouty arthritis, those diagnoses would not have compelled the ALJ to find in Austin Powder's favor. As noted above, the ALJ is free to choose to believe or disbelieve parts of the evidence from the total proof, no matter which party offered it. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977). Here, the ALJ chose to believe Stacy's proof, which he was free to do. Therefore, we affirm the Court of Appeals with regard to Stacy's injury claim.

**B.    Hearing loss permanent impairment rating.**

KRS 342.7305(4) provides that

When audiograms and other testing reveal a pattern of hearing loss compatible with that caused by hazardous noise exposure and the employee demonstrates repetitive exposure to hazardous noise in the workplace, there shall be a rebuttable presumption that the hearing impairment is an injury covered by this chapter, and the employer with whom the employee was last injuriously exposed to hazardous noise shall be exclusively liable for benefits.

Austin Powder does not dispute that Stacy's audiological tests revealed hearing loss compatible with exposure to hazardous noise. Furthermore, it does not dispute that Stacy was repeatedly exposed to hazardous noise. However, Austin Powder does dispute whether Stacy was injuriously exposed to

20

hazardous noise while in its employ. In support of that position, Austin Powder points out that Dr. Jones did not know the decibel level of noise to which Stacy was exposed at work.

Austin Powder did introduce evidence, through Smith, that the cab was pressurized to reduce noise, the decibel level in the cab was below the OSHA threshold, and Stacy's hearing protection would have brought the decibel level even lower. However, Stacy advised Dr. Jones that the drill was noisy and the cab was not pressurized. The ALJ was free to believe Stacy's assessment of the noise level of the drill, as was Dr. Jones. Furthermore, based on Stacy's testimony that he did not realize he had a hearing loss until tested in September 2012, the ALJ was free to infer Stacy's hearing loss was caused, partially if not wholly, by his work for Austin Powder. Therefore, we affirm the Court of Appeals, the Board, and the ALJ with regard to Stacy's hearing loss claim.

## IV. CONCLUSION.

The Court of Appeals is affirmed. The ALJ's findings that Stacy has permanent impairment ratings for his lumbar spine and loss of grip strength are vacated, as is his finding that Stacy is permanently totally disabled. This matter is remanded to the ALJ with instructions to determine: (1) whether Stacy suffered a lumbar spine injury entitling him to medical expense benefits; (2) whether Stacy's entitlement to lumbar spine medical expense benefits is temporary or permanent; and (3) the extent and duration of Stacy's wrist-related disability. The ALJ should note that, by vacating the prior finding of

21

permanent total disability, we do not intend to foreclose such a finding on remand. If the ALJ believes that the evidence supports such a finding on remand, then he or she is free to make that finding and to award benefits accordingly.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Walter Elliott Harding
Boehl Stopher & Graves, LLP

COUNSEL FOR APPELLEE, BILLY KEITH STACY:

McKinnley Morgan
Morgan Collins & Yeast